John A. Bruegger (State Bar # 250494)
Justin R. Parafinczuk (*PHV forthcoming*)
**PARAFINCZUK WOLF, PA**
5550 Glades Rd, Suite 500
Boca Raton, FL 33431
(954) 462-6700
(954) 462-6567 (facsimile)
jbruegger@parawolf.com
jparafinczuk@parawolf.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **TALAN BACALSO** | **COMPLAINT FOR DAMAGES** |
| **Plaintiff,** | |
| | 1. **Strict Product Liability-Design Defect** |
| | 2. **Strict Product Liability-Failure to Warn** |
| **v.** | 3. **Negligent Design** |
| | 4. **Negligent Failure to Warn** |
| **EPIC GAMES, INC.,** | 5. **Intentional Misrepresentation** |
| **ROBLOX CORPORATION,** | 6. **Negligence-Ordinary** |
| **MICROSOFT CORPORATION,** | 7. **Intentional Misrepresentation** |
| **MOJANG AB,** | 8. **Negligent Misrepresentation** |
| **JOHN DOES 1-50, and** | 9. **Fraud** |
| **JOHN DOE CORPORATIONS 1-50,** | 10. **Strict Product Liability-Design** |
| | 11. **Strict Product Liability-Failure to Warn** |
| **Defendants.** | 12. **Negligent Design** |
| | 13. **Negligent Failure to Warn** |
| | 14. **Negligence-Ordinary** |
| | 15. **Intentional Misrepresentation** |
| | 16. **Negligent Misrepresentation** |
| | 17. **Fraud** |
| | 18. **Punitive Damages** |
| | |
| | **DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Plaintiff TALAN BACALSO files this Complaint for Damages and Demand for Jury Trial against Defendants EPIC GAMES, INC., ROBLOX CORPORATION, MICROSOFT CORPORATION, MOJANG AB, and JOHN DOES 1-50, and JOHN DOE CORPORATIONS 1-50, to recover damages, pursuant to and under the laws of the State of California, arising from the severe injuries sustained because of Plaintiff's use of Defendants' products. In support thereof, Plaintiff alleges and states:

## I.  NATURE OF THE ACTION

1.    Many modern video games are fun and engaging adventures that allow individuals to immerse themselves in the world of games. This litigation is not a war on fun. Nor does it seek to curtail the creation and enjoyment of entertaining video games.

2.    Modern video games that are the subject of this litigation are not traditional arcade-style video games. Instead, the video game products subject to this litigation are created with "operant conditioning" to weaponize a video game for the unethical, reckless, and/or negligent application of this psychological technique to encourage a negative response as to the gamer and the positive outcome of increased revenue for the defendants. This litigation seeks to hold each Defendant accountable for its use of behavioral modification systems for which it did not warn nor provide appropriate safeguards, instead exposing minors to the known risks associated with continuous and excessive video game product use for the sake of increased profits.

3.    Each Defendant enlisted licensed psychologists and psychiatrists to incorporate the Cognitive Behavior Therapy technique of operant conditioning into its video game products, thereby exposing minor children to the same psychological techniques used by casinos without adequate warning, contrary to the standards applicable to those licensed mental health professionals that require informed consent.

4.    Each Defendant is aware that the behavior modification systems it uses results in continuous and excessive use of its video game products.

5.    Each Defendant is aware that continuous and excessive use of video game products increases its revenue, as the more time a player spends its products, the greater the likelihood that player will make in-game purchases.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

6.      Each Defendant is also aware of the established science regarding video game addiction[1] and supporting that prolonged use of video games, particularly by minors, can result in detrimental physiological and psychological impacts that manifest in impaired brain development and function, cognitive decline, disordered behavior, and other physical and emotional deficits.[2]

7.      One such condition, Internet Gaming Disorder ("IGD"), comes with a myriad of symptoms that include addiction, social isolation, depression, withdrawal symptoms that are often misdiagnosed as ADHD, exacerbation of ADHD and anxiety, all of which contribute to increased risk of suicide.

8.      Defendants knew of the risks of IGD and the other accompanying medical conditions yet continued to market Minecraft, Roblox, and Fortnite as "educational" despite being fully aware of these risks, and marketed their respective games and products to minors, even at most times without parental knowledge or consent in a school setting.

9.      Rather than mitigate the risks to minors, Defendants employed subversive operant conditioning behavior modification systems and marketed their video game products to children without introducing safeguards such as parental controls, age verification, warnings, or limitations on time or money spent in-game.

10.     While Defendants have profited from the addiction and disordered behavior caused by behavior medication systems they employ, generating billions of dollars of profits, the gamers — particularly minors — have been left to bear the burden of the damages resulting from this public health crisis.

11.     Minors exposed to Defendants' behavior medication systems not only experience physical and psychological effects but also endure the resulting consequences including worsened academic performance, social and familial relationships, employment prospects, and employability, among other things.

---

[1] MD Griffiths; Halley de Oliveira Miguel Pontes, *A History and Overview of Video Game Addiction*, The Oxford Handbook of Digital Technologies and Mental Health (Oct. 8, 2020) https://doi.org/10.1093/oxfordhb/9780190218058.013.2.

[2] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder,* 75 Neurosci. Biobehav. Rev. 314 (Apr. 2017).

-3-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

12.     Roblox, Minecraft, and Fortnite, and the Xbox video game platform,[3] are often the first video game products children are exposed to, and thereby serve as the gateway, or catalyst, to the addiction cycle and disordered behavior.

13.     As set forth more fully below, Plaintiff played Roblox, Minecraft, and Fortnite on the Xbox system, beginning when he was a minor child. As foreseen and intended by each Defendant, Plaintiff's exposure to the behavior modification systems in the Defendants' products resulted in continuous and excessive game play which triggered the expected physiological and psychological results and resulted in a disordered relationship with, and addiction to, video games. As a result, Plaintiff suffers from severe emotional distress, anxiety, depression, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, and a drastic decline in his grades, which led to academic dismissal from school.

14.     Through this lawsuit, Plaintiff seeks to hold Defendants accountable for their decisions to place profits over safety, which directly and proximately resulted in Plaintiff's significant harm.

## II. PARTIES

### A.     PLAINTIFF

15.     Plaintiff Talan Bacalso is a citizen and resident of the State of Missouri whose principal place of residence is St. Charles County. From the time that Plaintiff began gaming at the age of ten (10), he previously lived in Madison County, Illinois, then St. Louis County, Missouri prior to his current residence.

16.     Plaintiff is nineteen (19) years old at the time of this Complaint.

17.     Plaintiff began playing video games and using Defendants' products at approximately ten (10) years old. Since that time, Plaintiff has used and/or continues to use Defendants' products at an increasing, uncontrollable, compulsive, and/or addictive pace. Plaintiff has been injured and damaged, and continues to be injured and damaged, as a result of his use of, and addiction caused by his use of, Defendants' defective products as a minor child.

---

[3] Hereinafter, "Xbox platform" collectively refers to all Xbox consoles (including Xbox 360, Xbox One, Xbox One S, and Xbox One X) and Xbox online game platforms (including the Xbox Network, Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1

2    **B.    DEFENDANTS**

3        **Defendant Microsoft Corporation**

4        18.    Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its

5    principal place of business at One Microsoft Way, Redmond, Washington 98052.

6        19.    Microsoft is a video game developer and publisher that, at all times material hereto,

7    designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared,

8    distributed, marketed, supplied, and/or sold the Minecraft video game series and platform, either directly

9    or indirectly, to members of the public within the States of Illinois and Missouri, including to Plaintiff,

10    and the State of California.

11        20.    At all times material hereto, Microsoft designed, developed, tested, patented, assembled,

12    manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox

13    Platform – on which Fortnite, Roblox, and Minecraft could be played – to members of the general public

14    and school districts within the States of Illinois and Missouri, including to Plaintiff, and the State of

15    California.

16        21.    As of July 14, 1998, and continuing through the present, Microsoft is a foreign business

17    corporation actively registered to do business in the State of California at registration no. 2826638.

18        **Defendant Mojang AB**

19        22.    Defendant Mojang AB ("Mojang") is a Swedish company with its principal place of

20    business at Söder Mälarstrand 43, 118 25 Stockholm, Sweden.

21        23.    Mojang is a video game developer and publisher that, at all times material hereto,

22    designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared,

23    distributed, marketed, supplied, and/or sold the Minecraft video game series and platform, either directly

24    or indirectly, to members of the general public and school districts within the States of Illinois and

25    Missouri, including to Plaintiff, and the State of California.

26        24.    In September 2014, Defendant Microsoft acquired Defendant Mojang and its intellectual

27    property (including Minecraft) for $2.5 billion. Accordingly, Defendant Mojang is now a wholly owned

28    subsidiary of Defendant Microsoft.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

25.     Although Mojang initially developed, sold, and maintained Minecraft, following its acquisition by Microsoft, both Microsoft and Mojang have played direct roles in changes made to the design, development, testing, assembly, manufacturing, publishing, publishing, packaging, labeling, preparation, distribution, marketing, supply, and/or sale the Minecraft video game series that Plaintiff began playing. Indeed, both Mojang and Microsoft are responsible for the addictive design features in Minecraft described herein. Both Mojang and Microsoft have direct liability for the harm and injuries caused by Minecraft based on their own conduct.

**Defendant Roblox Corporation**

26.     Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 3150 South Delaware Street, San Mateo, California 94403.

27.     Roblox Corp. is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, and/or prepared Roblox at their California office. Roblox Corp. also distributed, marketed and/or supplied Roblox, either directly or indirectly, to members of the general public, including to residents of the States of Illinois and Missouri, including to Plaintiff.

28.     Roblox Corp. performs the majority of its development, sales, executive, and other essential business functions from its primary office in San Mateo, California. Roblox has maintained significant contacts with the state of California since its conception, including maintaining its headquarters in California since 2006.

**Defendant Epic Games, Inc.**

29.     Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, North Carolina 27518.

30.     Epic Games is a video game developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video game series and platform, either directly or indirectly, to members of the general public within the State of California and the States of Illinois and Missouri, including to Plaintiff.

31.    The true names and capacities of the Defendants, JOHN DOES 1-50 and JOHN DOE CORPORATIONS 1-50, are unknown to Plaintiff at the time of filing this Complaint and Plaintiff, therefore, sues said Defendants by fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been determined. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named Defendants are responsible in some manner for the occurrences alleged herein, and that Plaintiff's injuries and damages as alleged and set forth herein were proximately caused by such fictitiously named Defendants.

### III. <u>JURISDICTION AND VENUE</u>

32.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if repeated in full here.

33.    This suit alleges causes of action seeking relief arising under the laws of the State of California, including but not limited to the allegation that as a direct and proximate result of the Defendants' products described above and Defendants' negligent, deceptive, willful, immoral, reckless, and unlawful actions and inactions, representations and misrepresentations, including by omission, Plaintiff suffered and continues to suffer injuries and damages. Plaintiff has suffered and continues to suffer both injuries and damages that exceed the sum or value of $75,000, exclusive of interest and costs.

34.    This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332(a) because the controversy is between citizens of different states and the amount in controversy exceeds $75,000.00.

35.    This Court has general personal jurisdiction over Defendant Roblox Corp. because Roblox Corp. has its principal place of business in this District and because its continuous contact with this District renders it "at home" in this District. Defendant Roblox Corp. maintains its principal place of business in the San Mateo County, California.

36.    This Court has specific personal jurisdiction over Defendants Epic Games, Microsoft, and Mojang because they have each established sufficient minimum contacts in, to, or with California because each transacted business in California and regularly conducted business in California from which they respectively derive substantial revenue. Defendants do substantial business in the State of California and within the Northern District of California, advertise in this district, and receive substantial

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

compensation and profits from their Products within this District. Furthermore, Defendants purposefully and intentionally directed their activities to the residents of California, and purposefully and intentionally availed themselves to the benefits and protections of the laws of the state of California, and the market of the state of California, and continue to avail themselves in that manner. The controversy in this action is directly affiliated with, related to, and arises from Defendants' contacts with the state of California such that the exercise of jurisdiction over each Defendant by this Court is consistent with traditional notions of fair play and substantial justice and is both reasonable and proper.

37.    Defendants expected or should have expected that their business activities could or would have could or would have consequences within the State of California, as well as throughout the United States.

38.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, because, among other things: (a) each Defendant directed its activities at residents in this District; (b) each Defendant conducted substantial business in this District; (c) a substantial part of the counts giving rise to this action occurred in this District; and (d) Defendant Roblox is a resident of this District and citizen of this State.

## IV. GENERAL FACTUAL ALLEGATIONS

### A.    OPERANT CONDITIONING AS A TRADITIONAL THERAPY

39.    The games subject to this litigation have incorporated techniques known in psychology as "operant conditioning." Operant conditioning is a type of psychological treatment also called **instrumental conditioning**, in which voluntary behaviors are modified by association with the addition (or removal) of reward or aversive stimuli. The frequency or duration of the behavior may increase through reinforcement or decrease through punishment or extinction.[4]



---

[4] https://en.wikipedia.org/wiki/Operant_conditioning

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

40.    The American Psychological Association adopted a Code of Conduct that recognizes and requires that legal informed consent is required to deploy operant conditioning, and behavioral psychologists must take reasonable steps to protect a patient or subjects individual rights and welfare.[5]

41.    Instrumental conditioning is psychological treatment traditionally used to address or treat excessive maladaptive behaviors that a patient wishes to extinguish such as smoking and overeating,[6] or alternatively to increase a behavior that is not occurring enough, such as eating enough, lack of focus to study and correcting lack of personal hygiene.

**Traditional Operant Conditioning**

42.    Ethical use of operant conditioning, in compliance with the APA Code of Conduct is used to reduce unwanted and undesirable behaviors, such as eating disorders, chain smoking, and autism treatment to extinguish negative behavior.[7]

43.    The problem behavior is first observed and recorded as it naturally occurs in a variety of settings, and no attempt is made to modify the behavior. The therapist may conduct the observation and record the behavior. This part of the behavior modification program, is called baseline observation, provides a record of where and when the behavior occurred including duration and intensity. Behavioral measures are often plotted on a graph to provide a visual record of behavior. The baseline data are used to define the problem or target behavior as precisely as possible. The client and therapist also define the desired changes in this target behavior and set up specific behavioral goals to be met during treatment.

44.    This degree of precision in behavior analysis is rarely found in traditional psychotherapy. Behavioral observation continues throughout the treatment phase of the behavior modification program and changes from the baseline level are recorded. Examination of this ongoing record of behavioral progress allows both therapist and client to evaluate the effectiveness of the treatment throughout the treatment process. If behavior is not changing in the desired direction or pace, the treatment program can be altered or adjusted.

---

[5] American Psychological Association: Ethical Principles of Psychologists and Code of Conduct (adopted August 21, 2002 effective June 1 2003); chrome extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.apa.org/ethics/code/ethics-code-2017.pdf

[6] https://www.ebsco.com/research-starters/health-and-medicine/operant-conditioning-therapies

[7] *Id.*

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

45.     A licensed therapist must follow the applicable standards, including the APA Code of Conduct guidelines, in crafting an operant conditioning model to change a person's behavior which must include the informed consent of the subject patient that is having their own behavior modified.[8]

**Defendants' Reckless, Negligent and/or Unethical Application of Operant Conditioning**

46.     In contrast to traditional use of operant conditioning to extinguish negative behavior or promote positive behavior, the Defendants have utilized the unethical, reckless, and/or negligent behavioral psychologists to change human behavior by utilizing operant conditioning in game design, with the intent of promoting the dangerous and maladaptive behavior of "Continuous Video Game Play" without warning or obtaining the informed consent of parents, schools or gamers.[9]

47.     Ethical rules require knowledge, participation and informed consent of the subject whose behavior is being changed.

48.     Defendants each employed licensed psychologists and/or psychiatrists to create operant conditioning behavior modification systems for their products without warning that such psychological techniques were being used or of the risks associated with that use, failing to obtain meaningful informed consent to exposure to these systems.

49.     The use of operant conditioning in gaming goes beyond increasing sales. Instead, the application of operant conditioning is used with the primary goal of increasing sessions and length of time of video game play. The goal was continuous game play to the detriment of gamers.

50.     Defendants, with the assistance of behavior therapists and psychologists, used beta versions of Minecraft, Roblox, and Fortnite, and the systems used in the Xbox platform, with children as game testers to incorporate operant conditioning behavior modification systems into their products' design to ensure the continuous play was achieved at game launch.

51.     When an organization employs a behavioral psychologist, that psychologist still has a duty to do no harm.[10]

---

[8] American Psychological Association: Ethical Principles of Psychologists and Code of Conduct (adopted August 21, 2002 effective June 1 2003); chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.apa.org/ethics/code/ethics-code-2017.pdf
[9] *Id.*
[10] American Psychological Association: Ethical Principles of Psychologists and Code of Conduct (adopted August 21, 2002 effective June 1 2003); chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.apa.org/ethics/code/ethics-code-2017.pdf

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

52.    The psychologist hired by the Defendants had a conflict between their applicable standards, including the APA Code of Conduct, because the Defendants used the assistant of psychologists to elicit the behavior of continuous game play, which did harm many gamers and no steps were taken to inform gamers of the operant conditioning, the targeted behavior or protect the gamers from the harm of video game addiction.

53.    APA Code of Conduct mandates that a conflict between organizational demands of a psychologists require acknowledgement of the conflict and "under no circumstances may this standard be used to justify or defend violating human rights."[11]

54.    Likewise, the duty of care owed by each Defendant precludes violating human rights or facilitating the violation of human rights, particularly to increase profit.

55.    Parents, gamers, and schools are not aware that operant conditioning is being used on the players and no steps, such as disclosure of operant conditioning, disclosure that the targeted behavior was continuous play nor adequate tracking of game play hours was utilized in game design to protect gamers from the harm of addiction and the sequalae of addiction.

56.    In sharp contrast to traditional therapeutic uses of operant conditioning, the Defendants have used unethical, reckless, and/or negligent methods of creating negative maladaptive behaviors in children.

57.    The behaviors Defendants have sought to elicit do not pass muster under any applicable standards, including ethical standards binding on licensed therapists, because operant conditioning, intended to treat maladaptive behavior, was instead twisted to promote and increase maladaptive behaviors.

58.    The traditional operant conditioning procedures were inverted so that the behavior of gamers was studied and recorded to create excessive maladaptive behaviors, including but not limited to video game addiction, impulsivity, decreased ability to focus in class, inability to track or conceptualize time spent in a video game, inability to finish tasks and prioritize important tasks, and increased social isolation leading to anxiety and depression, increasing the suicide risk for extreme gamers.

---

[11] *Id.*

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

59.    The behavior being reinforced in Minecraft, Roblox, and Fortnite is continuous game play, which by ethical and social policy considerations is a negative behavior, especially in younger school-age children.

60.    Defendants monetarily incentivized the willing participation, and disregard of their ethical standards, of licensed psychologists in this reckless, negligent, and unethical abuse of treatment modality.

61.    Quoting an article published in the American Psychological Association:

> Psychologist Tim Nichols, PhD, loved video games as child. "Like any red-blooded American kid, I was playing on my Nintendo back in the 1980s and was a Sega guy in the '90s," he remembers. Now he gets paid to play. As "user research lead" at **Microsoft Studios**, Nichols is one of a growing number of psychologists in the video game industry. With the number of games and platforms exploding, companies that design and develop video games are increasingly turning to psychologists for help analyzing data and making sure their products are as effective as they can be. Some psychologists are even launching consulting businesses to assist game manufacturers or creating games of their own.[12]

62.    Upon information and belief, the APA with full backing by the Defendants and the Entertainment Software Association ("ESA") supported suppression and identification of video game addiction instead opting to call the addiction "Internet Gaming Disorder." This patient abandonment has led to a lack of diagnosis and treatment for children suffering from video game addiction.

## B.    OPERANT CONDITIONING BEHAVIOR MODIFICATION SYSTEMS IN GAMES.

### Historical Development and Modernization of Video Games

63.    The term "video game" is defined by California Civil Code §§ 1746-1746.5 as "any electronic amusement device that utilizes a computer, microprocessor, or similar electronic circuitry and its own monitor, or is designed to be used with a television set or a computer monitor, that interacts with the user of the device."

64.    Video games were first developed in or around the 1950s.

---

[12] https://www.apa.org/gradpsych/2012/01/hot-careers; Rebecca Clay Video Game Design and Development: Video Game Companies are increasingly tapping psychologists' expertise to make games even more compelling, challenging and fun. American Psychological Association

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

65.     Initially, games were only available to be played by the general public in arcades. Beginning in the 1970s, however, the first at-home video game devices ("consoles") appeared on the market.

66.     By the late 1990s and early 2000s, there were multiple at-home video game consoles, such as Xbox, PlayStation, and Nintendo's Wii, making video games easily accessible to most users from the comfort of their living room. Over the next ten years, video games moved to mobile devices and tablets, once again increasing accessibility to gameplay.

67.     Many video games – including Minecraft, Roblox, and Fortnite – can now be played on multiple different consoles, mobile devices, and tablets.

68.     Moreover, video games can be delivered to these consoles, mobile devices, and tablets in several diverse ways, such as physical discs, digital downloads, school laptops, online gaming networks, and cloud gaming services.

69.     In 2024, there are 1.17 billion gamers online, and global gaming revenues are at least $176.06 billion.[13]

70.     As the sophistication of gaming devices and game delivery methods has increased, so too has the sophistication of the design of games themselves.

71.     Unlike their predecessors, many modern-day games are enormous in scale, providing countless hours of non-repetitive, unique gameplay that allows players to become immersed in the world of the game.

72.     The ways in which game developers monetize their games have also changed over time. In the past, game developers earned revenue primarily through the one-time sale of their games. Although some game developers still follow this model, others – including Defendants – allow their games to be downloaded for no or minimal cost and generate revenue through purchases made within the game.

73.     In-game purchases can include, but are not limited to, cosmetic customizations for the player's character (e.g., hats, uniforms, hair styles), "boosters" that help their character perform better

---

[13] Jasmine Katatikarn, *Online Gaming Statistics and Facts: The Definitive Guide (2024)*, Acad. of Animated Art (Jan. 16, 2024), https://academyofanimatedart.com/gaming-statistics/.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

or progress faster within the game, and "season passes" that allow players to access exclusive in-game content.

74.     Many of these in-game purchases are relatively low cost, leading to them being termed "microtransactions."

75.     In-game items available for purchase are often heavily advertised to players through means such as in-game pop-up advertisements during gameplay, loading screens while users wait for gameplay to start, and in-game stores.

76.     Many games also offer game-branded products such as toys, energy drinks, apparel, bedding, home goods, board games, and more.

77.     Game developers that offer their games at no or low cost, such as Roblox, Minecraft, and Fortnite rely on these microtransactions to turn a profit. Indeed, the design and marketing strategy associated with such games is rooted, in part, in the theory that the revenue from the on-going microtransaction system will outweigh the revenue from a one-time-purchase game. That is because microtransaction spending can easily add up to hundreds, or even thousands, of dollars from an individual user.

78.     Accordingly, modern gaming companies are enlisting PhD behavioral psychologists and using research to implement programming into their games that will addict players with a goal of increasing the amount of playtime, thereby prolonging their exposure to in-game marketing for in-game purchases in order to improve the odds players will engage with microtransactions that generate profits for the game developer.

C.     **OPERANT CONDITIONING SYSTEMS AVAILABLE IN MINECRAFT, ROBLOX, AND FORTNITE**

79.     Minecraft uses a core gameplay loop to encourage continuous play. This involves repeatable, moment-to-moment actions like mining resources, crafting tools, and building structures. The player's decisions and accomplishments in each cycle provide a satisfying, immediate reward.

80.     Minecraft uses a secondary loop that includes long-term projects and goals built from the core gameplay loop to gather all game resources the play needs to create a false sense of a significant long-term achievement.

81.     Minecraft rounds out the operant conditioning with a meta loop which creates the ambitious target of a player mastering the game or building a functional world. These ambitious targets ensure the players have a reason "why" they need to return to the game.

82.     Roblox also uses a compelling core loop, a robust game progression system and a gaming community to reinforce coming back to the game.

83.     The Roblox core loop uses behavior techniques of immediate fun engaging players within the first five minutes of gameplay. Then Optimal Pacing is used to ensure the game is balanced in difficulty to the skill of the player to avoid feelings of inadequacy or difficulty creating a desire to continue playing and a false sense of achievement. Immediate feedback is provided to trigger positive reinforcement of the desired behavior of increased gameplay. To keep the continued play going an element of randomness which includes random events, new challenges or loot-drop system is deployed to lure in gamers.

84.     Fortnite was designed with numerous operant conditioning tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement.

85.     One tactic used by Epic Games is a psychological trick of "lose by a little, win by a lot" or "near miss" effect. This is an operant conditioning tactic used to reward the player when they win, and when a player loses a round, they lose by only a slight margin, compelling them to play another round because they were just a few moves away from winning. When players lose, they rationalize their defeat and often tell themselves that what topped them from winning was the smallest mistake. As a result, players are conditioned to keep trying under the mistaken belief that they are ever closer to winning.

**Rewards Reinforce Negative Behavior - Continuous Video Game Play**

86.     In the context of gaming products, rewards act as positive reinforcement, encouraging gamers to keep playing. Consider the satisfaction of leveling up, finding a rare item, or achieving a high score. Each of these milestones provides a reward, which triggers a dopamine release in the brain—the

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

internal "feel-good" chemical. This surge of dopamine reinforces the behavior, making it more likely that a gamer will come back to the game in search of that same pleasure.[14]

87.     Famed psychologist B.F. Skinner's research on reinforcement also emphasized the power of variable rewards—rewards that come at unpredictable times or intervals. In his experiments with pigeons, Skinner found that animals were more motivated to perform a task when they were rewarded on a variable schedule rather than at regular intervals. This concept translates well to games, where rewards are often distributed unpredictably. Think of loot drops in adventure games or rare cards in a deck-building game. The uncertainty of when and what reward will be given keeps players engaged, eager to discover what's next.

88.     All Defendants built operant conditioning into their respective games by positively reinforcing and rewarding continued video gameplay time and punishing users when they do not play or otherwise fail to conform to the desired behavior of increased play time and increased purchasing of microtransactions.

**Game Flow Keeps Player Connected to the Operant Conditioning**

89.     When a game's difficulty level is balanced just right—not too easy, but not too hard—it can lead to what psychologist Mihaly Csikszentmihalyi calls the "flow state." This is a state of deep focus where the player is completely absorbed in the activity, often losing track of time.[15] Games use incremental challenges to create flow, gradually increasing difficulty to keep players in the zone, fully engaged but not overwhelmed. Achieving flow is inherently rewarding, encouraging repeat play as players seek to experience it again.

**Social Identity in Gaming—Operant Conditioning**

90.     Games don't just offer individual rewards; they often fulfill social needs as well. Research has shown that social interactions in games, such as cooperation, competition, and team-based activities, are strong motivators for repeat play. According to Social Identity Theory, people derive a sense of self and belonging from their group affiliations.[16] When players form teams, clans, or guilds, they start to

---

[14] Skinner, B. F. (1938). *The behavior of organisms: an experimental analysis.* Appleton-Century.
[15] Csikszentmihalyi, Mihaly. (1990). Flow: The Psychology of Optimal Experience.
[16] Tajfel, H., & Turner, J. C. (1979). An integrative theory of intergroup conflict. In W. G. Austin, & S. Worchel (Eds.), The social psychology of intergroup relations (pp. 33-37). Monterey, CA: Brooks/Cole.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1   see themselves as part of a community, which encourages loyalty and continued participation.

2   91.   In a survey conducted by the Entertainment Software Association (ESA) in 2024, 73% of

3   U.S. gamers said they play games to connect with friends, while 73% noted that playing with others

4   increases their enjoyment of the game (ESA, 2024). Social games that involve interaction with friends

5   or online communities make the experience richer and more satisfying, which reinforces the desire to

6   keep playing.[17]

7   **Psychology of Progress—Operant Conditioning Tool**

8   92.   Games are known for their use of achievements, badges, and progress indicators—

9   elements that symbolize advancement and status. These features draw on the Goal-Setting Theory, which

10   posits that specific, challenging goals lead to higher performance and greater motivation.[18] When players

11   see a clear path to progression, such as leveling up or earning achievements, they are motivated to reach

12   those milestones, which enhances engagement and repeat play.[19]

13   **Badge Effect and Status**

14   93.   Badges, trophies, and leaderboards add an additional layer of motivation by appealing to

15   players' desire for recognition and status. Psychologists refer to this as extrinsic motivation—the drive

16   to earn rewards or recognition from external sources.[20] This is particularly powerful in social games,

17   where players can see each other's achievements, creating a sense of friendly competition. The desire to

18   achieve status among peers often keeps players coming back, striving for new achievements and

19   recognition.

20   **D.   CONTINUOUS VIDEO GAME PLAY ORIGINATING FROM OPERANT**

21   **CONTINUING RESULTS IN VIDEO GAME ADDICTION**

22   94.   Operant conditioning is a behavior modification system serving as the architecture of

23   video game design that many of today's video games utilize. The use of operant conditioning towards a

24

25

26   [17] https://www.theesa.com/video-games-remain-lifelong-source-of-entertainment-for-190-6-million-americans/
    [18] Locke, Edwin & Latham, Gary. (1991). A Theory of Goal Setting & Task Performance. The Academy of Management

27   Review. 16. 10.2307/258875.
    [19] *Id.*

28   [20] Deci, E. L., & Ryan, R. M. (1985). Intrinsic Motivation and Self-Determination in Human Behavior. New York, NY:
    Plenum.https://doi.org/10.1007/978-1-4899-2271-7

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  gamer can be one of the factors contributing towards video game addiction; operant conditioning is the

2  strategy while video game addiction can be the by product or operant conditioning.[21]

3      95.    Once engaged in the game, the player sets asides their rules for their daily life and accepts

4  the rules of the game as the new way to live life.[22]

5      **Attention Deficit Disorders Exacerbated with Video Game Addiction**

6      96.    A three-year longitudinal study by Gentile et al. demonstrated that the more time a child

7  spends playing video games the more problems they have with attention span.[23] In fact, children with

8  attention span problems such as ADHD, are more attracted to video games and find those kids neglect

9  activities that would have otherwise demanded their control and attention such as homework, sports and

10  household chores.[24]

11      97.    The sequalae of video game addiction causes anxiety, impulsivity, low self-esteem, poor

12  school performance, emotional and social intelligence deterioration, social isolation, cognitive decline,

13  exacerbation of ADHD, visual problems, seizures, orthopedic injuries, depression, addiction, orthopedic

14  injuries from overuse injuries of controllers, suicide attempts and suicide.[25]

15  **E.    ABUSE OF OPERANT CONDITIONING TO INCREASE GAMEPLAY**

16      98.    By creating their games in this manner, Defendants' goal was not healthy gaming, but

17  rather it has always been continuous video game play for profit.

18      99.    Defendants did not implement measures to allow parents and teachers to monitor and

19  control video game play time. Parental controls are defective in most games and non-existent in the most

20  frequently played Minecraft platforms.

21      100.    Each Defendant is accountable for failing to warn that operant conditioning is being used

22  in Fortnite, Roblox, and Minecraft for the goal of continuous video game play. Additionally, Defendants

23

24

---

25  [21] Daniel Vu. "An Analysis of Operant Conditioning and its Relationship with Video Game Addiction" ART 108: Introduction to Games Studies (2017).
   [22] *Id.*

26  [23] Gentile D.A., Swing E.L., Lim C.G., Khoo A. Video game playing, attention problems, and impulsiveness: Evidence of bidirectional causality. Psychol. Pop. Media Cult. 2012;1:62–70. doi: 10.1037/a0026969.

27  [24] *Id.*
   [25] Lérida-Ayala V, Aguilar-Parra JM, Collado-Soler R, Alférez-Pastor M, Fernández-Campoy JM, Luque-de la Rosa A.

28  Internet and Video Games: Causes of Behavioral Disorders in Children and Teenagers. Children (Basel). 2022 Dec 31;10(1):86. doi: 10.3390/children10010086. PMID: 36670637; PMCID: PMC9856521.

failed to include available safeguards, such as accurate time tracking in cross platform, game sharing and educational versions of Minecraft, as well as defective and/or non-existent parental controls.

101.    Defendants' suppression of the diagnosis and treatment of video game addiction coupled with the failure to warn of continued video game play carried a risk of video game addiction and the sequalae flowing from the addiction demonstrates a reckless disregard for the safety and well-being of children, including Plaintiff.

102.    Furthermore, Defendants are aware that science has shown that prolonged use of video games by minors can result in lack of full development of the prefrontal cortex, cognitive decline, and inability to reach full educational potential.[26]

103.    Internet gaming disorder comes with a myriad of symptoms that include addiction, social isolation, depression, withdrawal symptoms that are often misdiagnosed as ADHD, exacerbation of ADHD and anxiety, all of which contribute to increased risk of suicide.

104.    Defendants knew of the risks of IGD and the other accompanying medical conditions yet continued to market their games as "educational" despite being fully aware of these risks, Defendants marketed their respective games and products to minors, even at most times without parental knowledge or consent in a school setting.

F.    **EXCESSIVE VIDEO GAME PLAY AND EFFECTS ON ADOLESCENT BRAINS**

105.    For almost two decades, research on the interaction between video game usage and the adolescent brain has shown that extensive usage has a severe impact on the adolescent brain, including loss of grey matter, which leads to severe physical and mental effects on the child. Many of these effects are indicators or consequences of IGD, which is the addiction to video gaming.

106.    One of the ways that the impact of video game usage is studied is research about the role dopamine plays in the brain during gameplay.

107.    Video games can and do cause an intense dopamine release in the user that is similar in magnitude to that experienced by substance abuse or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between nerve cells in the brain,

---

[26] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder,* 75 Neurosci. Biobehav. Rev. 314 (Apr. 2017).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

as well as between the brain and the body. Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors, and particularly neurodivergent minors, whose brains are still developing. Increased frequency of dopamine releases can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

108.    Video game addiction has been suggested to be as addictive as heroin. [27]

109.    In minors, the creation of this level of dopamine high at such a young age is difficult to overcome.

110.    The repetitive release of dopamine creates, reinforces, and strengthens a dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the video games more and more, first at an increasing rate and then with compulsive desire until the impulse to use the video games develops into a disordered use or addiction.

111.    This dopaminergic response triggers impulsive behaviors outside of the gaming world consisting of life-altering impulsivity and inability to control behaviors that can and do cause a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage and/or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, malnutrition and/or undernutrition, risk of suicide, risk of harming others and other harmful effects, all to the severe detriment and damage to the minor, and to the severe emotional detriment and pecuniary or economic damage to their families and caretakers. [28]

112.    Additional research on the impact of video games reports physical changes to the brain and brain matter as a result of gameplay.

---

[27] https://abc13.com/post/fortnite-can-be-as-addictive-as-heroin-health-experts-say-/4410795/
[28] E. Suárez-Soto, A. Peris-de la Hoz, A. Sanchez-Fernandez-Quejo, E. Rodriguez-Toscano, N. Lagunas, B. Reneses, A. De la Torre-Luque, Problematic gaming use and psychological distress among Spanish young adults: A comprehensive study, The European Journal of Psychiatry, Volume 39, Issue 1,2025,100279, ISSN 0213-6163,https://doi.org/10.1016/j.ejpsy.2024.100279.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

113.    Research has shown that prolonged use of video games affects the prefrontal cortex of the user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control. The operant conditioning techniques utilized in video games rewards impulsivity, which causes a lack of development in the prefrontal cortex. Instead, the regions of the brain that create impulsivity are overutilized and fed while executive function is starved leading to a lack of brain development in the prefrontal cortex. Research has also concluded that such use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders.

114.    Clinical evidence has shown that users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated with substance abuse and addiction, such as hangovers, changes in mood, ability to adapt, withdrawal, conflict, and recurrence symptoms.

115.    Empirical studies indicate that gaming disorders are associated with detrimental health-related outcomes.[29]

116.    Brain imaging studies have shown that excessive use of video games negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

117.    Other studies have shown that disordered and/or excessive use of video games leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Gamers lack time awareness of how long they have played a game.

118.    During adolescence, the prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization. This region of the brain does not reach maximum capacity until the age of 25 to 30. The executive control center of the prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals. The lack of full development of the prefrontal cortex is arguably why young people are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes, minors are less able to weigh

---

[29] Pierpaolo Limone, Benedetta Ragni, Giusi Antonia Toto, The epidemiology and effects of video game addiction: A systematic review and meta-analysis, *Acta Psychologica*, Volume 241, 2023,104047, ISSN 0001-6918, https://doi.org/10.1016/j.actpsy.2023.104047.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1   potential negative consequences and curb potentially harmful behavior like excessive use of video

2   games, which further impacts frontal lobe development.

3       119.    Brain imaging studies related to IGD have shown structural changes in the brain,

4   particularly a reduction in white-matter density (consisting mostly of cells and axons that transmit signals



11   from the cerebellum to other brain regions) and grey-matter volume (associated with emotions,

12   perception, memory, and motor control). Specifically, studies showed several regions of the brain

13   demonstrated reduction in grey-matter volume in gaming disorder participants, as depicted here:[30]

14       120.    Brain activation studies have shown that the use of video games causes changes in the

15   reward and impulse control regions of the brain, and that engaging with video games activates regions

16   of the brain in a manner similar to the way the brain is activated in response to cue-exposure to drugs

17   (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

18       121.    Additional brain activation studies have shown that individuals with gaming disorders

19   have impaired inhibitions, and that video game cues activate craving, attention, and executive function

20   areas of the brain. Those cognitive, sensory-motor, and emotional processes may be associated with

21   long-term changes to the brain because of prolonged use of video games. Regions that showed activation



[30] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder*, 75 Neurosci. Biobehav. Rev. 314 (Apr. 2017).

-22-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  in response to video game cues in gaming disorder participants in more than two studies are depicted in

2  the following image:[31]

3      122.    Structural studies of the brain have shown alterations in the volume of the ventral striatum

4  (a critical component of motor and reward systems in the brain) are possible because of changes in

5  reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that

6  individuals who engage in excessive use of video games tend to have lower cognitive function,

7  particularly in areas of verbal ability and working memory.

8      123.    Research has shown that a neurodivergent minor with a diagnosis of Attention-Deficit

9  Hyperactivity Disorder ("ADHD") or Autism Spectrum Disorder is at a higher risk of developing video

10  game disorder or addiction, which can worsen one's ability to control impulsivity and result in brain

11  damage.[32] Research has shown that while use of video games may foster creativity in some minors, such

12  potential benefits are outweighed by the risk of developing addiction or disordered use of video gaming

13  products, which typically develops swiftly in minors and neurodivergent individuals. This is particularly

14  true when video games incorporate addictive and manipulative tactics, as well as other problematic

15  psychological programing.

16  **G.    GAMING ADDICTION IS A RECOGNIZED AND DIAGNOSABLE CONDITION**

17      124.    Addiction to and disordered use of video games and internet gaming is a recognized,

18  diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric

19  Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[33] The diagnostic

20  symptoms of internet gaming disorder currently set forth in DSM-5 include: (1) preoccupation with

21  playing and/or using video games; (2) withdrawal symptoms (sadness, anxiety, irritability, and/or other

22  unpleasant symptoms) when access to play and/or use is removed, precluded, or reduced; (3) tolerance

23  - the need to spend more time playing and/or using video games to satisfy the urge and desire to do so;

24  (4) loss of control or the inability to reduce video game playing and usage time and/or unsuccessful

25

---

26  [31] Aviv Weinstein et al., *Neurobiological Mechanisms Underlying Internet Gaming Disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

27  [32] Micah O. Mazurek & Christopher R. Engelhardt, *Video Game Use in Boys with Autism Spectrum Disorder, ADHD, or Typical Development*, 132 Am. Acad. of Ped. J.L. 2 (2013).

28  [33] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).

-23-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

attempts to quit gaming; (5) giving up other activities or loss of interest in previously enjoyed activities due to compulsion to play video games; (6) continuing to play and use video games despite negative or problematic consequences; (7) deceiving family members or others about the amount of time spent playing and/or using video games; (8) using video games to "escape" or relieve negative moods, such as guilt or hopelessness; and (9) jeopardized school or work performance or relationships due to playing and/or using video games.

125.    Nationally recognized institutions such as the Cleveland Clinic and the National Center for Biotechnology Information (NCBI) also recognize video game addiction and categorize the addiction as falling under the general category of IGDs.[34]

126.    As of 2022, "Gaming disorder"—disordered use of and/or play with video games—is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[35] "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

## H.    AMOUNT OF TIME PLAYED CORRELATES TO SEQUALAE OF VIDEO GAME ADDICTION

127.    One study showed positive bioelectrical prefrontal activity during gaming tasks of healthy gamers between the ages of 8 and 12 who limited game play to 20 minutes.[36]

---

[34] Shabina Mohammad, Raghad A Jan, & Saba L Alsaedi, *Symptoms, Mechanisms, and Treatments of Video Game Addiction*, Cureus (Mar. 31, 2023).
[35] Other disorders found in that subcategory include alcoholism and gambling addiction.
[36] Mondéjar T., Hervás R., Johnson E., Gutiérrez-López-Franca C., Latorre J.M. Analyzing EEG waves to support the design of serious games for cognitive training. *J. Ambient Intell. Humaniz. Comput.* 2019;10:2161–2174. doi: 10.1007/s12652-018-0841-0.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

128.    In contrast, a similar study of unhealthy gamers with an IGD diagnosis showed a thinner cortex in the brain with a smaller volume of gray matter.[37] The reward-related network and the IGD gamers inhibition system were altered, the orbitofrontal cortex and anterior cingulate cerebral area were overstimulated, similar to a drug addiction.[38]

129.    Recently, a study by Kwak et al. longitudinally compared 14 adolescents with internet gaming disorder to 12 professional internet gaming students who practiced for about ten hours a day, within a defined support system that included practice, physical exercise, lectures on team strategy, rest and mealtimes.[39] After one year, both groups showed increased brain activity within the attention system of the parietal lobe. However, professional gamers improved problematic behaviors, impulsivity, aggression, depression and anxiety, while adolescents with internet gaming disorder showed no behavioral improvement and a dysfunctional brain activity within the impulse control network in the left orbitofrontal cortex.

## I.    ADDICTIVE GAME DESIGN FEATURES CAUSE SIGNIFICANT HARM TO MINORS

130.    The human population most vulnerable to the combination of game developers' microtransaction methodology and addictive operant conditioning design features are minors; minors who are neurodivergent are even more susceptible to becoming addicted. Video game developers, including Defendants, knew this, but nonetheless purposefully designed their games and platforms to exploit that vulnerable population, causing injury and detriment, including to Plaintiff. Doing so has yielded the intended results: video game developers, including Defendants, have earned extraordinary financial revenue from this group of users as a result of placing their addictive products that are targeted to minors into the stream of commerce.

---

[37] Lee D., Park J., Namkoong K., Kim I.Y., Jung Y.-C. Gray matter differences in the anterior cingulate and orbitofrontal cortex of young adults with Internet gaming disorder: Surface-based morphometry. J. Behav. Addict. 2018 doi: 10.1556/2006.7.2018.20

[38] Smirni D, Garufo E, Di Falco L, Lavanco G. The Playing Brain. The Impact of Video Games on Cognition and Behavior in Pediatric Age at the Time of Lockdown: A Systematic Review. Pediatr Rep. 2021 Jul 14;13(3):401-415. doi: 10.3390/pediatric13030047. PMID: 34287345; PMCID: PMC8293336.

[39] Kwak K.H., Hwang H.C., Kim S.M., Han D.H. Comparison of Behavioral Changes and Brain Activity between Adolescents with Internet Gaming Disorder and Student Pro-Gamers. Int. J. Environ. Res. Public Health. 2020;17:441. doi: 10.3390/ijerph17020441

131.    Each Defendant knew or was aware, or should have known and should have been aware, that their respective products were dangerous and harmful to users, particularly minors, when used as intended and in a reasonably foreseeable manner. In fact, each Defendant intentionally caused and designed their respective products to most effectively cause users with developing brains to become addicted or disordered in their desire to use the products. To that end, upon information and belief, each Defendant employed behavioral psychologists and/or neuroscientists to develop products that incorporated design features premised upon psychological tactics engineered to keep users engaged in using the products for longer and longer periods of time.

132.    The microtransactions and other technologies, designs, features, mechanisms, algorithms, artificial systems, programs, and other processes each Defendant incorporated into their products were implemented in a manner such that users (and, when users are minors, their caretakers) do not understand and have no way of understanding (or uncovering through reasonable diligence) that their use of the products involves engagement with intentionally addictive design features that are physically damaging to their brains and bodies, and financially rewarding to the Defendants.

133.    There is no meaningful disclosure of the addictive mechanisms and microtransactions in each Defendant's products at the time they are purchased and/or downloaded to allow prospective users to make informed decisions as to whether using the products are desirable, appropriate, safe, or worth the potential risk.

134.    At all times material hereto, each Defendant targeted consumers/purchasers, including minors, and specifically including Plaintiff herein, to use their respective products and engage in microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

135.    Each Defendant, with knowledge of Plaintiff's age and without regard to other neurodivergent traits or social factors, targeted Plaintiff with manipulative programming to prolong use of their products in hopes of inducing Plaintiff to engage in microtransactions during their use of the products. As a result of Plaintiff's use of each Defendant's products, and because of the addictive design features incorporated into the products, Plaintiff suffered addiction, social isolation, depression, anxiety,

1 loss of friends and relationships, and damage to his grades, resulting in an academic dismissal from

2 school.

3 **J.     SPECIFIC OPERANT CONDITIONING METHODS USED BY DEFENDANTS**

4 <u>**MINECRAFT**</u>

5 **Mojang and Microsoft Design, Develop, and Market Minecraft**

6     138.    Minecraft was first developed and released by Mojang in November 2011.

7     139.    In September 2014, Microsoft acquired Mojang and its intellectual property (including

8 Minecraft).

9     140.    After its acquisition of Mojang, Microsoft has been directly and actively involved with

10 Mojang in the design, development, testing, production, manufacture, labeling, marketing, advertising,

11 promotion, supply, sale, and distribution of Minecraft. Indeed, since acquiring Mojang, Microsoft has

12 overseen over 125 updates to Minecraft.

13     141.    To date, over 300 million copies of Minecraft have been sold,[40] and the game averages

14 around 200 million players per month.[41]

15 **Minecraft Targets Young Children to Increase Profits and Addict Younger Children**

16     142.    Minecraft is rated as safe for children 10 and older by the Entertainment Software Rating

17 Board ("ESRB"), which is the leading game-rating system for games in the United States.

18     143.    Nonetheless, Microsoft and Mojang know that much of Minecraft's player base is

19 younger than 10.

20     144.    Studies have shown that approximately 53% of children aged 6 to 8 and 68% of children

21 aged 9 to 12 play Minecraft.[42]

22

23

24

---

[40] Britney Nguyen, Minecraft Just Surpassed 300 Million Sales–Here's The Only Video Game Still Beating It, Forbes (Oct.
25 16, 2023), https://www.forbes.com/sites/britneynguyen/2023/10/16/minecraft-just-surpassed-300-million-sales-heres-the-only-video-game-still-beating

26 it/#:~:text=Minecraft%20has%20reached%20over%20300,Minecraft%20Live%202023%20this%20weekend.
[41] Spencer Whitworth, Minecraft Live Player Count (September 2024), Sportskeeda (Apr. 1, 2025),

27 https://www.sportskeeda.com/minecraft/minecraft-live-player-count.
[42] Jane Mavoa & Marcus Carter, Minecraft Teaches Kids About Tech, But There's A Gender Imbalance At Play, The

28 Conversation (Jan. 16, 2018), https://theconversation.com/minecraft-teaches-kids-about-tech-but-theres-a-gender-imbalance-at-play-89496.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

145.    Microsoft and Mojang organize their advertisement and collaboration strategies around the interests of young children and make a significant portion of their revenue from young children and their families.

146.    Despite Minecraft's age rating, Minecraft has engaged in numerous in-game virtual and physical product collaborations with child-friendly entities such as LEGO, Avengers, Mothers of the Galaxy, Spiderman, Moana, Star Wars, Sonic the Hedgehog, Super Smash Bros., The Incredibles, Angry Birds, Frozen, Ice Age, Sponge Bob SquarePants, Toy Story, Minions, Power Rangers, Fortnite, and more.[43]

147.    Most, if not all, of these collaborations are geared towards a wide audience that unmistakably includes minors under the age of 10. Many young children watch Disney movies or play with LEGOs or Hot Wheels. Microsoft and Mojang explicitly and intentionally market Minecraft to young children by collaborating with the above entities.

148.    In addition to virtual collaborations, Microsoft and Mojang also have physical Minecraft merchandise they produce or sponsor, most of which are toys or children's items. For example, Microsoft and Mojang have created a kids educational touchscreen smart watch; an LED lamp that looks like a Minecraft torch; a glitter motion light; plush toys based on Minecraft characters; Minecraft themed LEGO sets, action figures, board games, and Hot Wheels; foam weapons; clothing; pajamas; and Halloween costumes. Minecraft also has a line of books for children as young as five that are intended to teach children how to read.

149.    In 2025, in collaboration with Microsoft, Warner Brothers Studios released *A Minecraft Movie* based on the gameplay, characters, and intellectual property of Minecraft, licensed to Warner Brothers from Microsoft. With a production budget of $150 million, by June 2025 *A Minecraft Movie* earned over $954 million worldwide.[44] A sequel is in development and planned for a release in July 2027.[45]

---

[43] Category: Collaborations, Minecraft Wiki, https://minecraft.wiki/w/Category:Collaborations (last visited July 24, 2025).
[44] "A Minecraft Movie - Financial Information". The Numbers. Nash Information Services, LLC. Retrieved July 1, 2025.
[45] Makuch, Eddie (October 9, 2025). "A Minecraft Movie 2 Announced, Coming July 2027". *GameSpot*. Retrieved October 9, 2025.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**Minecraft School Edition**

150.    Children are introduced to Minecraft School Edition at a young age which creates an "operant conditioning" lab to assure school age children are taught to respond to game stimuli that create the desired response, such as continued play or purchasing more microtransactions.[46]

151.    Defendants have had knowledge that IGD has been a consequence of continued video game play for well over a decade.

152.    On information and belief, Defendants have spent considerable time and money to suppress awareness among the medical community, parents, and schools of the video game addiction epidemic.

153.    Upon information and belief, Minecraft Education was introduced into the school system with a fully drafted implementation program to assure schools would assist in unknowingly assuring children would become addicted to video games. This Trojan Horse of video game addiction began in schools—not in parent's homes—and was touted as "educational."

154.    There is no parental consent or ability to track the amount of video game play for time spent on Minecraft Education. Instead, many children were first introduced to Minecraft from a school issued laptop without parental consent to use operant conditioning in an educational or video game setting.

155.    Video game sharing and cross platform play assured the real amount of video game play would always be elusive for a parent since both allow children to play games that are not trackable for parents.

156.    IGD comes with a myriad of symptoms that include addiction, social isolation, depression, withdrawal symptoms that are often misdiagnosed as ADHD, exacerbation of ADHD and anxiety, all of which contribute to increased risk of suicide.

157.    Defendants knew of the risks of IGD and the other accompanying medical conditions yet continued to market Minecraft as "educational" despite being fully aware of these risks, Defendants

---

[46] Irwin Helvey, Casey & Gates, Lucille & Rountree, Paige & Cariveau, Tom. (2023). Gamified human operant research: A brief introduction to Minecraft Education. 10.17605/OSF.IO/VT58F.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

marketed their respective games and products to minors, even at most times without parental knowledge or consent in a school setting.

**Microsoft and Mojang Deceptively Promise Safety and Educational Value in Minecraft**

158.    Microsoft and Mojang do not adequately inform users of the inherent risks involved with using and playing Minecraft or that the product was designed to make users play more to their potential harm.

159.    Instead, Minecraft's website provides users, potential users, and parents with false assurances of safety. For example, Microsoft and Mojang state that:

    a.   they "hold [them]selves accountable for making Minecraft as safe as possible for everyone."[47]

    b.   it is "so important that [their] games are a safe and welcoming place for all players."[48]

    c.   "player safety is a priority for Mojang to ensure everyone feels safe."[49]

    d.   their "community standards help [them] build a community that is open and safe for everyone."[50]

160.    Minecraft does not offer any parental controls for Minecraft Education or offline play of Minecraft, like the versions played by Plaintiff.

161.    Minecraft does feature some parental controls for online Xbox play, but they are grossly deficient. While minor accounts for children younger than 16 are automatically created with some restrictions on in-game communications and other features, there is no age verification process. If a minor who is under 16 wants to create a Minecraft account with a fictitious birth date, they can, and can then create an account and play Minecraft without the restrictions of an account where a user represents they are under 16.

162.    Microsoft and Mojang could, but choose not to, require express parental consent for minors under 16 to create an account. If a minor under 16 creates an account, they can still access almost

---

[47] Minecraft Help Center – General Safety, Minecraft, https://help.minecraft.net/hc/en-us/articles/8047895358605 (last visited July 24, 2025).
[48] *Id.*
[49] Community Standards for Minecraft, Minecraft, https://www.minecraft.net/en-us/community-standards (last visited July 24, 2025).
[50] Minecraft End(er)-User License Agreement ("EULA"), Minecraft, https://www.minecraft.net/en-us/eula (last visited Apr. 8, 2025).

all game content and purchase items. There is no daily spending limit automatically imposed on any minor accounts.

163.    Parents can access parental controls to change the automatic restrictions set by Microsoft and Mojang if their minor is under 16, however, such features are only available if a parent creates their own account and links it to the minor's account. To change any parental control settings, the parent must first know the account exists, and subsequently know the gamertag information to link their account to their minor's account.

164.    Microsoft and Mojang do not provide parental controls within Minecraft regarding screen time, gameplay, and/or usage. Microsoft and Mojang could, but choose not to, allow parents to set time limits on their Minecraft account. Microsoft and Mojang also could, but do not, allow any users to set self-imposed time limits on their Minecraft account.

165.    Lack of parental controls are by design to conceal the operant conditioning tricks built into the video game as well as conceal the time spent playing Minecraft.

166.    At account setup, Minecraft's website contains no warnings labels, banners, or messaging informing minor, parents or schools that operant conditioning is being used to program the children to continuously play Minecraft. There is no warning of the sequalae of video game addiction and the attendant side effects of video game addiction stemming from excessive use of Microsoft and Mojang's product. Users do not know their behavior is being manipulated through a system of rewards and punishments in the video game.

167.    Microsoft and Mojang do not disclose to the public or users of Minecraft any of the psychological tactics or addictive features they purposefully incorporate into their product. Instead, Microsoft and Mojang tout their Minecraft game as educational and have developed Minecraft Education Edition for use in the classroom.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

168.    Minecraft: Education Edition ("Minecraft Education") is a game-based learning platform. Minecraft Education uses the Minecraft graphics with "features built specifically for learning environments." It includes over "600 standards-aligned lessons,"[51] and includes coursework across various subjects.[52]



169.    Though Minecraft's age-rating is for children 10 and older, Minecraft Education has lesson plans for children as young as 5.[53] and encourages school leaders, educators, and parents to use Minecraft. Minecraft Education provides resources so educators can "learn to teach with Minecraft."[54]

170.    Accordingly, the use of Minecraft Education introduces children to Minecraft that are years younger than Minecraft's age rating.

**Minecraft was Designed with Intentionally Addictive Features.**

171.    Upon information and belief, Microsoft and Mojang actively employ or have employed psychologists, behavioral experts and actual minor gamers to work on Minecraft development.

172.    One example of an intentionally addictive feature within Minecraft is a specific in-game reward system known as "advancements" or "achievements" created by Microsoft and Mojang in order to incentivize players to engage in repeated and prolonged sessions playing Minecraft.

---

[51] What is Minecraft Education?, Minecraft Education, https://education.minecraft.net/en-us/discover/what-is-minecraft (last visited July 24, 2025).
[52] Minecraft Education For Educators: Get Started, Minecraft Education, https://education.minecraft.net/en-us/get-started/educators (last visited July 24, 2025).
[53] Minecraft's own website states "[s]oon students from kindergarten to graduation can utilize Minecraft Education." Back to School Preview: Make it Minecraft!, Minecraft Education (Apr. 8, 2025), https://education.minecraft.net/en-us/blog/back-school-preview-make-it-minecraft
[54] Minecraft Education For Educators: Get Started, Minecraft Education, https://education.minecraft.net/en-us/get-started/educators (last visited Apr. 8, 2025).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

173.    In Minecraft Java, when a user completes a specific action or "advancement," they receive a number of "Experience Orbs" or "EXP" or "XP," which are used like a currency to enhance user's in-game equipment and reach new levels of the game. XP is gained by performing specific tasks, like successfully defending a village from a raid or killing a hostile monster:[55]



174.    When a user obtains enough XP, they can "level up," meaning the user's character advances to a higher level, becomes more powerful, and gains access to new talents and equipment.[56]

175.    In Minecraft Bedrock, when a user completes a specific action or task, they receive an achievement or trophy. The achievement is then logged in the player's Minecraft account. Most achievements provide in-game rewards such as creator items or emotes when unlocked.

176.    Not all advancements and achievements are equally easy to obtain. Instead, Microsoft and Mojang have intentionally created advancements and achievements that incentivize many hours and/or days of gameplay. By way of example, Microsoft and Mojang chose to reward players for playing Minecraft for 100 days, playing underwater for 10 minutes, building maps from pieces hidden throughout the game, trading 1,000 emeralds, collecting a surplus of resources, and more. These achievements can take countless hours across many days to unlock due to the complexity and/or time-consuming nature of the steps needed to unlock the achievement.

177.    This reward system creates addictive engagement and encourages players to continue gameplay.

178.    Microsoft and Mojang knew that Minecraft contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms

---

[55] Advancement, Minecraft Wiki, https://minecraft.fandom.com/wiki/Advancement (last visited July 24, 2025).
[56] How to Earn Experience Points & Level Up in Minecraft, (Jan. 24, 2022), https://www.dummies.com/article/home-auto-hobbies/games/online-games/minecraft/how-to-earn-experience-points-and-level-up-210066/.

-33-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Microsoft and Mojang marketed and misrepresented Minecraft as "educational" and safe for use by minors.

179.    The use of operant conditioning, a lack of warnings about the harms of use, no option for self-imposed limits on playtime, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Microsoft and Mojang designing Minecraft with harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, despite Microsoft and Mojang's knowledge that abuse and compulsive use of its product by foreseeable users, i.e., minors and neurodivergent individuals, can and did lead to users, including Plaintiff, suffering from addiction, withdrawal symptoms, negative consequences or cognitive processes, depression, anxiety,  and a decline in his schoolwork.

180.    Microsoft and Mojang marketed and misrepresented Minecraft as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

181.    Minecraft's behavior modification systems include a core gameplay loop to encourage continuous play. This involves repeatable, moment-to-moment actions like mining resources, crafting tools, and building structures. The player's decisions and accomplishments in each cycle provide a satisfying, immediate reward.

182.    Minecraft's behavior modification systems also use a secondary loop that includes long-term projects and goals built from the core gameplay loop to gather all game resources the play needs to create a false sense of a significant long-term achievement.

183.    Minecraft rounds out the operant conditioning with a meta loop which creates the ambitious target of a player mastering the game or building a functional world. These ambitious targets ensure the players have a reason "why" they need to return.

## MICROSOFT'S XBOX AND XBOX PRODUCTS

**Xbox Product Basics**

184.    Xbox is a video gaming brand, owned and operated by Microsoft, that consists of Xbox gaming consoles, as well as online video gaming through the Xbox network, Xbox Game Pass, and Xbox

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    Cloud Gaming.

2    185.    Each version of the Xbox console provides users with the ability to play video games

3    using a hard copy of the video game, a digital copy downloaded from the Microsoft Store (also known

4    as Xbox Games Store, hereinafter "Xbox Store"), using the Xbox Network (formerly known as Xbox

5    Live), and/or using Xbox Game Pass or Cloud Gaming.

6    186.    Microsoft developed and maintains the Xbox Store – a product-platform through which

7    users can purchase thousands of games to be stored on their console through digital download, and for

8    use with its Xbox consoles.

9    187.    Though third parties create many of the games available in the Xbox Store, Microsoft

10    profits from all monetary transactions that occur within the store, taking thirty percent of revenue from

11    sales of third-party games.[57]



20    188.    Likewise, Microsoft profits from all monetary transactions that occur within the third-

21    party games played on its Xbox Platform. Microsoft markets the Xbox Store as "safer for the whole

22    family" to use: Microsoft also touts that:

23        a.    "Xbox strives to create a safer gaming experience for you and your family."[58]

---

[57] Tom Warren, Microsoft Explored Reducing its Xbox Store Cut to Shake Up Console Gaming, The Verge (Mar. 2, 2021), https://www.theverge.com/2021/5/2/22415712/microsoft-xbox-store-cut-epic-games-court-documents.

[58] Family-Friendly Gaming for Everyone, Xbox, https://www.xbox.com/en-US/family-hub#:~:text=FAMILY%2DFRIENDLY%20GAMING%20FOR%20EVERYONE&text=Xbox%20strives%20to%20create%20a,Windows%2C%20and%20Xbox%20mobile%20apps (last visited July 24, 2025).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

b.    "[Xbox holds itself] accountable for making our platforms as safe as possible for all players."[59]

c.    "[Xbox] will promote the availability of our safety tools through our platforms, support channels, services, on our websites and in retail stores to reach more players and parents."[60]

189.    The Xbox Network is an online multiplayer gaming service created and operated by Microsoft for use with its Xbox consoles. The Xbox Network includes the Xbox Store and Xbox Cloud Gaming.

190.    Xbox Cloud Gaming or Game Pass is operated by linking a device, either a console, tablet, phone, or computer, to a remote server in the cloud. Gameplay is saved in the cloud and can be accessed and used from numerous devices at any given location. Thousands of games are available in the Xbox Cloud Gaming and Xbox Network library, including Minecraft.

**Microsoft's Xbox Uses an Achievement System that Encourages Compulsive Game Use**

191.    Microsoft knows that third-party games targeted to minors – such as Minecraft – are available on its Xbox Platform. Microsoft is therefore aware that minors and those who are susceptible to addiction are using its Xbox Platform. Nonetheless, Microsoft chose to add features to its Xbox Platform that intentionally addicts such users.

192.    Microsoft actively employs or has employed psychologists and neuroscientists within its Xbox User Research and Xbox Player Experiences & Platform departments.[61]

193.    Upon information and belief, through the use of such psychologists and neuroscientists, Microsoft developed and implemented design features to keep users compulsively and addictively engaged with its platform, despite its knowledge that abuse, addiction, and compulsive use by minors can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

---

[59] Dave McCarthy, Our Shared Commitment to Safer Gaming, Xbox, Dec. 14, 2020, https://www.xbox.com/en-US/family-hub/safety-principles

[60] Id.

[61] See Deborah Hendersen, LINKEDIN, https://www.linkedin.com/in/deborahjohendersen (last visited Sept. 29, 2025); Todd Kelley, LINKEDIN, https://www.linkedin.com/in/toddakelley (last visited Sept. 29, 2025); Carolina Labbé, LINKEDIN, https://cl.linkedin.com/in/carolinalabbe (last visited Sept. 29, 2025); Emily Joseph, LINKEDIN, https://www.linkedin.com/in/emilymjoseph1?trk=public_post_feed-actor-name (last Sept. 29, 2025).

194.    For example, within its Xbox Products, Microsoft developed and implemented a program called the Xbox achievement system ("Xbox achievements" or "achievements"). Xbox achievements is a game-like program that tracks the amount of time a player spends in third-party games on the Xbox platform and the player's actions within those games.

195.    Microsoft encourages game developers to use its achievement system by creating tasks for players to accomplish within their respective games.

196.    Microsoft makes available to all users the achievements that are available within the games they are playing.

197.    Many of the achievements created within Microsoft's achievement system are met by players spending excessive time in-game. For example, a player can earn the Minecraft "Passing the Time" achievement by playing Minecraft on Xbox for 100 days.

198.    If a user has their Xbox Platform on but fails to engage with it for a length of time, Microsoft displays a screensaver that highlights a user's progress in unlocking achievements within a third-party's game.

199.    When these achievements are earned, Microsoft – not the third-party games – notifies the player with a console-based – not game based – message. This console-based message is akin to the lights and sounds of a slot machine in a casino. Microsoft plays a reward-signifying noise and displays a bright message on the screen highlighting the player's accomplishment.

200.    Xbox achievements are categorized as either standard achievements or rare achievements. When a rare achievement is unlocked, the graphic displayed on the user's screen in game indicates that the achievement is rare. A rare achievement is one that less than 10% of users have unlocked.

201.    In addition to such messages, Microsoft awards players a "Gamerscore" for each achievement earned. In game-like fashion, Microsoft tabulates each player's Gamerscore for the achievements earned across all games played on the Xbox platform and displays that score for all other users to see.

202.    While Xbox achievements earned and a player's Gamerscore can be an indication to other users and friends about how much and how well a user has played, Microsoft's purpose for implementing Xbox achievements goes beyond the social aspects of gaming. Rather, Microsoft created the Xbox

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

achievement system in order to incentivize extended and continued gameplay on its platform, resulting in more purchases of in-game or of third-party games, all of which increase Microsoft's profits.

203.    Microsoft's platform does not contain any warnings about the general harmful nature of its achievement system or general gaming addiction. At account setup, the Xbox website contains no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from the use of the Xbox platform. Users are not provided with information regarding potential physical and mental harm associated with use of the platform, including stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders at account setup or at any time during usage. Users are not provided with information regarding potential physical and mental harm associated with use of its platform.

204.    Microsoft could, but chooses not to, provide warnings about the harms caused by use of its platform without any changes to the achievement system or the content of the achievements.

205.    Microsoft could, but chooses not to, implement user protections or safeguards, such as user-imposed time limits on gameplay, increased age verification at account setup, and automatic parental controls imposed when a minor creates an Xbox account.

**Microsoft's Xbox Products Do Not Include Adequate Parental Controls**

206.    To make an Xbox profile, users must first create a Microsoft account, or link to a preexisting Microsoft account.

207.    If a user already has a Microsoft account, no age verification is required to create an Xbox profile.

208.    Most parental controls are not automatically applied to a minor's Xbox profile upon creation. A parent or mother can only implement parental controls by accessing the console itself and adjusting settings to apply controls, by logging into the Xbox profile wherein they want to impose parental controls, or by connecting their child's account to their own Microsoft profile. To engage with/change any parental control settings, the parent must first know the account exists and subsequently know the child's gamertag information to implement controls on their minor's account.

209.    Microsoft could, but chooses not to, automatically implement all parental controls on minors' Xbox profiles upon creation.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

210.    The use of operant conditioning, a lack of warnings about the harms of use, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Microsoft designing Xbox Products with harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, despite Microsoft's knowledge that abuse and compulsive use of its product by foreseeable users, i.e., minors and neurodivergent individuals, can and did lead to users, including Plaintiff, suffering from addiction, withdrawal symptoms, negative consequences or cognitive processes, depression, anxiety,  and a decline in his schoolwork.

211.    Microsoft marketed and misrepresented Xbox Products as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

## ROBLOX CORP.

**Roblox Gameplay Basics**

212.    Roblox is a video game and platform that was developed and published by Roblox Corp. The game was released in September 2006.

213.    At present, Roblox has approximately 111.8 million daily active users.[62]

214.    More than 45% of the consumers playing Roblox are under age 13.[63]

215.    Roblox is available to play on gaming consoles, computers, tablets, and cellular devices.

216.    Roblox is an online game that is free to download and play, making it easily accessible to all users, including minors.

217.    Individuals that wish to play Roblox must create a Roblox account.

218.    In order to create a Roblox account, individuals must include a birth date, username, and password.

219.    Users of any age can create a Roblox account, though users cannot enter a birth date for any year after 2020. Roblox Corp. does not require users to verify their age when creating a Roblox account. Accordingly, users can represent that they are younger or older than their actual age.

---

[62] Roblox Corp. Homepage, https://corp.roblox.com/ (last visited Sept. 29, 2025).
[63] The Roblox Corp. Homepage, https://corp.roblox.com/ (last visited Sept. 29, 2025).

220.    Users are also not required to obtain parental consent to create a Roblox account nor to play Roblox.

221.    Roblox Corp. created the online currency "Robux," which can be obtained by (a) purchasing it with real currency; (b) receiving recurring stipend given to users with a Roblox Premium membership; and (c) earning it from selling "game passes" or "developer Products" to other Roblox platers.

222.    Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increases.

223.    Roblox has hosted over 3.7 billion virtual transactions on its platform.

224.    Roblox Corp. admits in public filed documents that it has the ability to "dynamically apply relevant content filters, anti-addiction rules, payment limits, parental; consent requirements, and certain other regional requirements."[64]

225.    For example, the games available to any particular user will vary based upon the age they entered when generating their account and what games Roblox's algorithm recommends to the users, and games can be restricted using ID verification requirements.

226.    In November of 2024, Roblox Corp. announced, "major updates to [its] safety systems and parental controls." It claimed these updates were implemented because "safety is and always has been foundational to everything [it does] at Roblox.

227.    The changs Roblox Corp. made in 2024 included changes to viewable content for each age group, parental controls for minor's screen time usage, and a new minimum age at sign up.

228.    April of 2024, Roblox Corp. implemented further updates to parental controls, stating that "[s]afety underpins everything we do at Roblox, particularly the safety of our youngest users." These 2025 updates included the ability for parents to view their minor's top Roblox games the minor has played and how long the minor spent in each game for the past week. Parents can now also block specific games and experiences for their minors.

---

[64] *Earning on Roblox*, Roblox Creator Hub, https://brands.roblox.com/resources/activating-on-roblox-the-virtual-economy (last visited Sept. 29, 2025).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

229.    Until 2024, Roblox Corp. did not provide parental controls for minor's screen time and usage in Roblox. Roblox Corp. could have allowed parent-imposed time limits but instead chose not to allow parents to set time limits on their minor's Roblox account for over eighteen years of operation.

230.    Until approximately September 2024, Roblox Corp. allowed users to represent their age as young as one year old and have access to virtually all content on the platform. Even now, parents whose minors are over the age of 12 cannot set restrictions on spending limits, set time limits, change privacy settings, or manage friends and communication on their minor's account. Roblox Corp.'s changes to parental controls in 2025 did not address these failures to protect and limit minor users.

231.    Until 2025, Roblox Corp. did not provide guardians with the ability to block specific games and experiences, nor for guardians to view how much time their minor spends in each respective game.

232.    The implementation of these restrictions and changes by Roblox Corp. in 2024 and again in 2025 demonstrates its understanding of its responsibility to implement such restrictions and safety measures, and further, demonstrates how easily Roblox Corp. can implement restrictions and safety measures in general. The changes that Roblox Corp. implemented in 2024 and 2025 did not require game by game review by Roblox. Corp., but instead were implemented as system-wide updates.

233.    Despite its ability to implement anti-addiction rules, specific parental controls, payment limits, and restrictions, upon information and belief, Roblox Corp. instead chooses not to implement those restrictions in order to increase its profit.[65]

**Roblox is Marketed to Minors Yet Lacks Adequate Safety Features**

234.    Roblox Corp. does not inform users that operant conditioning techniques were used to elicit the targeted behavior of continued video game play which posed a risk of develop internet gaming disorder and the injuries that correspond to IGD.

---

[65] See Roblox Corporation, Form 10-Q (May 1, 2025), p. 68
(https://www.sec.gov/ix?doc=/Archives/edgar/data/0001315098/000131509825000118/rblx-20250331.htm
("...[R]equirements for verified parental consent before allowing children to create an account may limit the use of our Platform or reduce our overall demand for our Platform, which would harm our business, financial conditions, and results of operations").

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

235.    Instead, Roblox Corp. provides users, potential users, and guardians false assurances of safety.[66] For example, Roblox Corp. states that:

    a.  it has "built a platform with safety at the foundation;[67]

    b.  it "spend[s] hundreds of millions of dollars each year to meet [its] safety mission;[68]

    c.  users should "learn about how Roblox's commitment to safety and civility helps students grow;[69]

    d.  it "strive[s] to make [its] systems as safe as possible by default, especially for [its] youngest users;[70]

    e.  its age recommendations for its product are "grounded in child development research and informed by industry standards, essentially confirming its reliance on scientific research about adolescent development and content consumption;[71]

    f.  its recommendations are created by "examin[ing] global industry standards and consult[ing] child development experts;[72] and

    g.  its product is part of the "[n]ew era of teaching and learning," and teaches educators how to "pilot Roblox in [their] class or school district," assuring parents, educators, and students that its product is safe for use of all ages.[73]

236.    While Roblox does feature some parental controls in its product, almost all of these parental controls can only be applied to minors' accounts if the minor is under 13, despite Roblox Corp.'s alleged desire to create one of the safest online environments.

237.    Roblox Corp. states on its website that:[74]

---

[66] Matt Kaufman, CFO, Driving Civility and Safety for All Users, https://corp.roblox.com/newsroom/2024/07/driving-civility-and-safety-for-all-users (last visited Sept. 29, 2025).
[67] Matt Kaufman, CFO, Driving Civility and Safety for All Users, https://corp.roblox.com/newsroom/2024/07/driving-civility-and-safety-for-all-users (last visited Sept. 29, 2025).
[68] *Id.*
[69] Education, Roblox, https://education.roblox.com/ (last visited Sept. 29, 2025).
[70] Naren Koneru, Eleonore Vonck, Open Sourcing Roblox Sentinel: Our Approach to Preemptive Risk Detection (Aug. 7, 2025), https://corp.roblox.com/newsroom/2025/08/open-sourcing-roblox-sentinel-preemptive-risk-detection.
[71] Allowed Experience Controls, Roblox, https://en.help.roblox.com/hc/en-us/articles/31247519953172-Experience-Controls (last visited Sept. 29, 2025).
[72] Content Maturity Labels, Roblox, https://en.help.roblox.com/hc/en-us/articles/8862768451604-Content-Maturity-Labels (last visited Sept. 29, 2025).
[73] Education, Roblox, https://education.roblox.com/ (last visited Sept. 29, 2025).
[74] Roblox Privacy and Cookie Policy, Roblox, https://en.help.roblox.com/hc/en-us/articles/115004630823-Roblox-Privacy-and-Cookie-Policy (last visited Sept. 29, 2025).

-42-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

> ▼ **First, get the go-ahead**
>
> If you're under 13 years old, please get permission from your parent or guardian to use
> Roblox. You shouldn't use our Services without their go-ahead.

238.    Roblox Corp. could, but does not, allow any users to set self-imposed time limits on their Roblox account.

**Roblox Corp.'s Monetization of Intentionally Addictive Game Design**

239.    Roblox Corp. designed the game-creation aspect of its product to allow users to create their own Roblox video games for play and purchase by other Roblox users, including minors.

240.    Though third parties create many of the games, upon information and belief, Roblox Corp.'s own in-house developers also create games for users to play.

241.    Roblox Corp. profits from all monetary transactions that occur within these created games, whether created internally by Roblox Corp., or created by third-party users.

242.    Roblox Corp. constructed a "Creator Hub" on its website. The Creator Hub provides users with instructions (including "how-to" videos) from Roblox Corp. on how users can create their own Roblox games and also provides users with tools that enable or facilitate creation of their own Roblox games.

243.    Users that create their own games are referred to as "creators" or "developers." Upon information and belief, some the creators or developers include child psychologists and/or were designed with the assistance of child psychologists.

244.    Roblox Corp.'s website boasts that its top ten developers made, on average, $33.9 million in 2024.[75]

245.    Roblox Corp. reports its developers have been collectively paid $3.3 billion since 2018.[76]

246.    Beyond working with developers to create additive games, Roblox Corp. purposefully designed other features within its product to intentionally addict users.

247.    Roblox Corp. designed an achievement system within Roblox that rewards users for completing various tasks or actions. These achievements are not based upon a user's time or actions

---

[75] https://corp.roblox.com/newsroom/2025/09/roblox-annual-economic-impact-report
[76] https://create.roblox.com/docs/production/earn-on-roblox

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

within a third-party game "experience," but rather the user's time and actions on Roblox's platform itself. For example, a user playing Roblox can unlock an achievement for playing Roblox for three days in a row, ten days in a row, and twenty days in a row. Likewise, users can earn an achievement for playing Roblox for an hour. When the user unlocks an achievement, they can see what percentage of other users have unlocked the achievement. This system is designed to keep users engaged with the game, incentivize long periods of gaming repeated across multiple days, and ultimately increase Roblox Corp.'s profits.

248.    Roblox Corp. knows its product incorporates addictive designs that pose risks of causing users to develop dangerous and disordered use and overuse of the product. In fact, Roblox Corp. developed addictive strategies, game designs, and monetization schemes, implemented them on the Roblox platform itself and then instructed those developing "experiences" for its platform to incorporate those addictive features into their games that would be offered to minors.

249.    Upon information and belief, Roblox Corp. designed Roblox and the addictive strategies, game designs, and monetization schemes offered in its game and game design studio in conjunction with psychologists, neuroscientists, and other behavioral experts to intentionally maximize the likelihood of addiction of minor and neurodivergent users.

250.    Roblox Corp. admits to consulting child development experts for aspects of game development.[77] Roblox Corp. actively employs or has employed psychologists and behavioral experts within its People Science and Analytics department and User Experiences department.[78]

251.    The use of operant conditioning, the use of microtransactions within an otherwise free product, a lack of warnings about the harms of use, no self-imposed limits on playtime, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Roblox Corp. employing harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive

---

[77] Allowed Experience Controls, Roblox, https://en.help.roblox.com/hc/en-us/articles/8863284850196-Allowed-Experiences-Controls (last visited Sept. 29, 2025).
[78] See, e.g., Erica Snow, LINKEDIN, https://www.linkedin.com/in/erica-snow-phd-75272b39 (last visited Sept. 29, 2025); Philip Simmons, LINKEDIN, https://www.linkedin.com/in/philippsimmons (last visited Sept. 29, 2025); Carissa Kang, LINKEDIN, https://www.linkedin.com/in/carissakang (last visited Sept. 29, 2025).

engagement, despite Roblox Corp.'s knowledge that abuse and compulsive use of its product by foreseeable users, i.e., minors and neurodivergent individuals, can and did lead to users, including Plaintiff, suffering impacts on brain function, addiction, withdrawal symptoms, negative consequences on cognitive processes, and other injuries. Roblox Corp. marketed and misrepresented Roblox as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

252.     Roblox's behavior modification systems also use a compelling core loop, a robust game progression system and a gaming community to reinforce coming back to the game.

253.     The Roblox core loop uses behavior techniques of "immediate fun," engaging players within the first five minutes of gameplay. Then "optimal pacing" is used to ensure the game is balanced in difficulty to the skill of the player to avoid feelings of inadequacy or difficulty creating a desire to continue playing and a false sense of achievement. Immediate feedback is provided to trigger positive reinforcement of the desired behavior of increased gameplay. To keep the continued play going an element of randomness which includes random events, new challenges or loot-drop system is deployed to lure in gamers.

## **FORTNITE**

**Fortnite Gameplay Basics**

254.     Fortnite is an online video game and game platform designed, developed, and published by Defendant Epic Games.

255.     Fortnite is free to play, making it easily accessible to all users, including minors.

256.     Fortnite was first released in 2017 and is now available in three distinct game mode versions that share the same general design and engine.

257.     Fortnite: Battle Royale is a free-to-play battle royale game in which up to 100 users fight in a progressively shrinking arena to be the last person standing. Users can play alone, in a duo, or in a "squad" of 3-4 players. When users land "inside the game," the user must scavenge for weapons, items, resources, and vehicles while trying to stay alive, attack, and eliminate other users. Battle Royale is

frequently Fortnite's most popular game and is the game mode to which many attribute Fortnite's success.[79]

258.    Fortnite: Save the World is a cooperative hybrid tower defense-shooter and survival game in which up to four users fight off zombie-like creatures and defend objects with traps and fortifications they can build. Users are awarded a number of in-game items from and during missions, including hero characters, weapon and trap schematics, and survivors, all of which can be leveled up through gained experience to improve their attributes. Save the World is the only pay-to-play game mode of the Fortnite franchise.

259.    Fortnite Creative is a sandbox game mode in which users are given complete freedom to create worlds by spawning any item from Battle Royale on a personal island and can create games such as battle arenas, racecourses, platforming challenges, and more.

260.    Each of Epic Games' Fortnite products has similar graphics, art assets, and game mechanics.

261.    Fortnite has an average of 239 million monthly players and a peak of 15 million players in a day.[80]

262.    Less than two years after Fortnite's release, the games had generated over $9 billion in revenue through microtransactions and in-game purchases. In 2021 alone, Fortnite generated $5.8 billion in revenue.[81]

263.    Fortnite game Products are monetized using V-Bucks: in-game currency that can be purchased with real-world funds or earned through completing missions and other achievements in Save the World.[82]

---

[79] The Week Staff, What is Fortnite and Why is it So Popular?, The Week, https://theweek.com/93700/fortnite-battle-royale-news (Aug. 3, 2018).

[80] This statistic is as of July 2023. *Fortnite Player Count: How Many People Play the Game?* The Econ. Times (Jul. 14, 2023), https://economictimes.indiatimes.com/news/international/us/fortnite-player-count-how-many-people-play-the-game/articleshow/101767141.cms?from=mdr.

[81] This statistic is as of July 2023. Fortnite Player Count: How Many People Play the Game? The Econ. Times (Jul. 14, 2023), https://economictimes.indiatimes.com/news/international/us/fortnite- player-count-how-many-people-play-the-game/articleshow/101767141.cms?from=mdr.

[82] Sunil Gill, Fortnite Revenue, Player Count & Net Worth 2024, Priori Data (Apr. 1, 2024), https://prioridata.com/data/fortnite-statistics/.

264.    Fortnite includes a feature called a "Battle Pass," which is the same feature as a "season pass" as described above. The Battle Pass in Fortnite allows players to earn various rewards by "levelling up" the Pass. Levelling up can be done by earning medals during gameplay, completing challenges, and purchasing the levels with V-Bucks.[83] V-Bucks are in-game currency that can be purchased with real-world funds or earned through completing missions and other achievements in Save the World.

265.    V-Bucks in Save the World can be used to buy loot boxes, in the form of llama-shaped pinatas, to gain a "random" assortment of items.

266.    V-Bucks in Battle Royale can be used to buy cosmetic items like character models or the game's battle pass: a tiered progression of customization rewards for gaining experience and completing certain objectives during the course of a Battle Royale season.

267.    These features are only available if a user purchases a Battle Pass. The purpose of the Battle Pass is to keep players engaged in hours of gameplay trying to earn rewards, and to increase profits for Epic Games through the purchase of in-game content.

**Fortnite's Youth-Focused Partnerships Contradict Game Rating but Increase Profits**

268.    Fortnite's Battle Royale and Save the World are rated T for Teen, i.e., recommended for individuals aged 13 and above. This does not mean younger children cannot use them or that Epic Games does not know that children under 13 are using Fortnite Products. Rather, Epic Games is aware and markets Fortnite to consumers of all ages, and particularly to minors.

269.    Despite its T rating, survey results from 2019 show that 53% of U.S. children aged 10-12 played Fortnite weekly, compared to 33% of U.S. teens aged 13-17.[84]

270.    Even though most Fortnite games are rated T, Fortnite (specifically Battle Royale) has engaged in numerous collaborations with child-friendly entities such as Disney, LEGO, Marvel, NERF, Air Jordan, DC Comics, PAC-MAN, the NFL, Ninja, Rocket League, Ghostbusters, Star Wars, TRON, Neymar Jr., the NBA, LeBron James, Ariana Grande, Naruto, Indiana Jones, Dragon Ball, Spiderman,

---

[83] What is the Battle Pass? Where Can I Learn More?, Fortnite Support, https://www.epicgames.com/help/en-US/c-Category_Fortnite/c-Fortnite_Gameplay/what-is-the- battle-pass-where-can-i-learn-more-a000084706 (last visited Sept. 3, 2024).
[84] National Research Group, Fortnite: The New Social Media? (June 4, 2019), available at https://assets.ctfassets.net/0o6s67aqvwnu/5z4ja8fNx2NputEG49AVWs/ff1f591ad988f9a30856bab6 8e3908bb/NRG_Fortnite_White_Paper.pdf.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Batman, TikTok, The Nightmare Before Christmas, Wreck-It Ralph, Lewis Hamilton, Teenage Mutant Ninja Turtles, Nike, Pirates of the Caribbean, and more.[85]

271.    Most, if not all, of these collaborations are geared towards a wide audience that unmistakably includes minors under the age of 13. Many young children watch Disney movies, play with LEGOs, or listen to the music of pop stars like Ariana Grande. Epic Games is explicitly and intentionally marketing its Fortnite games to young children by collaborating with the above entities.

272.    Not only does Epic Games engage in in-game collaborations, but they also have physical merchandise they produce or sponsor, most of which are toys or children's items. For example, Fortnite creates plastic toy loot boxes and battle boxes, action figures, NERF guns, trading cards, board games, motorized toy cars, LEGO sets, and Halloween costumes. Fortnite has partnered with children's toymakers like Hasbro to create some of these items.

273.    Epic Games knows that young children play Fortnite.

274.    Epic Games organizes its advertisement and collaboration strategies around the interests of young children. And in 2024, Epic Games's projected annual revenue is $5.8 billion.[86] As a result of, in part, its partnership strategies, Epic Games will make a significant portion of that $5.8 billion from young children and their families, while its partnerships further encourage children under 13 to keep using its products.

**Fortnite was Designed with Intentionally Addictive Features**

275.    Epic Games designed Fortnite with numerous psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

---

[85] Josh Taylor, Every Single Fortnite Collab & Crossover in Battle Royale's History, Dexerto (Aug. 26, 2024), https://www.dexerto.com/fortnite/every-fortnite-collab-crossover-battle-royale-history- 1645672/.
[86] Josh Howarth, Fortnite User and Growth Stats 2024, Exploding Topics (Jul. 22, 2024), https://explodingtopics.com/blog/fortnite-stats.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

276.    Epic Games actively employs or has employed psychologists and behavioral experts within its User Experiences department and Online department.[87]

277.    Upon information and belief, Epic Games designed Fortnite in conjunction with psychologists and other behavioral experts to ensure the addiction of minor and neurodivergent users.

278.    The use of microtransactions within an otherwise free product, a lack of warnings about the harms of use, no self-imposed limits on playtime, and other features described herein are all examples of Epic Games employing these psychological tactics.

279.    Epic Games failed to disclose that it designed the Fortnite products with numerous psychological tactics, such as operant conditioning, to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, i.e., minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

280.    One tactic used by Epic Games is a psychological trick of "lose by a little, win by a lot" or "near miss" effect. Essentially, when a player loses a round, they lose by only a slight margin, compelling them to play another round because they were just a few moves away from winning. When players lose, they rationalize their defeat and often tell themselves that what topped them from winning was the smallest mistake. As a result, players want to play another match over and over again.

281.    The "near miss" effect means that when users perceive that they lost by only a slight margin, they do not actually have to win a match to feel the high of a win. Such strategy lies in getting users close to the feeling of winning, because when they are that close, they feel the same buzz and go on to play more rounds. On the other hand, when they do win a round, they win a lot of perks, giving them a spurt of dopamine and the adrenaline rush to play again.

---

[87] See, e.g., Ben Taels, LINKEDIN, https://www.linkedin.com/in/ben-taels-06913a15 (last visited Sept. 4, 2024); Celia Hodent, LINKEDIN, https://www.linkedin.com/in/celiahodent (last visited Sept. 4, 2024); Video Games, Psychology, and the User Experience with Dr. Celia Hodent (Epic Games), NC State University Libraries, https://www.lib.ncsu.edu/events/video-games-psychology- and-user-experience-dr-celia-hodent-epic-games#:~:text=Video%20Games%2C%20Psychology%2C%20and%20the,Games)%20%7C%20N C%20State%20University%20Libraries (Feb. 2, 2016); Katelyn Procci, LINKEDIN, https://www.linkedin.com/in/katelynprocci (last visited Sept. 4, 2024).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

282.    In the hopes of increasing their rank in the game through wins, players continue to play without any pause or rest.

283.    Fortnite also uses random reward tactics—known in psychology as the "variable interval schedule" or "variable ratio schedule"—the idea that randomized small wins will continue to draw in users. **This is the same mechanism used by casinos to keep their patrons gambling.**[88]

284.    With each small win, the brain is rewarded with a small spurt of dopamine—no matter how random small rewards may be.

285.    Additionally, the design of Fortnite keeps players drawn in. The bright and vibrant colors and cartoonish representation of the game make it more appealing than other bleak multiplayer battle royale games.

286.    Similarly, the mechanics of the game inject elements of variety, allowing players to find ideal hiding spots, loot drops, explore the entire map, build towers and forts using resources, and more. In designing such mechanics, Epic Games ensures that players never once get bored while playing.

287.    To keep players even more engaged, Epic Games often rolls out updates that keep players busy with engaging and fresh features, new maps, live events, and the latest trends. Such updates can also remove minor glitches that may be bothering the players as well. Fortnite also keeps players coming back daily by giving "Daily Quest" assignments that players can complete to earn V-bucks:[89]



[88] Weinschenck, S., "Use Unpredictable Rewards to Keep Behavior Going," *Psychology Today* (Nov. 13, 2013), https://www.psychologytoday.com/us/blog/brain-wise/201311/use-unpredictable-rewards-to-keep-behavior-going
[89] https://fortnite.fandom.com/wiki/Quests_(Battle_Royale).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

288.     Players will thus continually log into the game to complete these quests and earn V-bucks for in-game spending.

289.     These features, combined with the ease of accessibility—the game is free to play on multiple platforms and devices—fosters addiction in minors and young adults because it draws players in and allows them to play nearly anywhere at any time.

290.     Epic Games knew that its Fortnite Products contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, Epic Games marketed Fortnite as "educational" and safe for use by minors (inside and outside the classroom).

291.     Epic Games misrepresented Fortnite as educational and safe for use by minors and neurodivergent individuals, including Plaintiff, while knowing that abuse, addiction, and compulsive use by such product users can lead to brain damage and injury, and knowing that it had designed and developed Fortnite to be as addictive as possible.

292.     Epic Games did not inform and concealed from the public, including Plaintiff, that Fortnite products pose significant risks of harm to users due to Epic Games' decision to design Fortnite to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury in those individuals.

**Fortnite Deceptively Promises Safety and Educational Value**

293.     Epic Games assures users that it wants its Fortnite product to be a "safe place for [users] to play games."[90]

294.     Despite assurances of safety, the addictive properties and design features, as alleged herein, of the Fortnite game products are so dangerous to users, and especially minors, that several health and behavioral centers across the country have published resources for parents specifically warning

---

[90] Epic Games: Community Rules, Epic Games, https://www.epicgames.com/site/en- US/community-rules (last visited Nov. 26, 2024).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

about Fortnite addiction.[91] Many health experts have concluded that Fortnite is more addictive than heroin and other illegal drugs.[92]

295.    Despite these third-party warnings of the dangers of Fortnite, Epic Games has failed to disclose the risks of harm purposefully built into the Fortnite game products.

296.    Although Fortnite features some parental controls in its product, they are grossly deficient. While minor accounts are automatically created with some restrictions on communication and other features, there is no age verification process. If a minor who is under 13 wants to sign up with a fictitious birth date, they can, and can play Fortnite without the restrictions of an account where the user represents they are under 13.

297.    Fortnite could, but chooses not to, require express parental consent for minors under 13 to create an account. If a minor under 13 creates an account, they can still access most game content and purchase items.

298.    For example, while Fortnite can be played through Microsoft's Xbox Cloud Gaming, no subscription to Microsoft's Xbox Game Pass is required to play Fortnite. The games are free through the Xbox Cloud Gaming service:[93]



YOU DO NOT NEED AN XBOX GAME PASS PAID SUBSCRIPTION TO PLAY FORTNITE THROUGH XBOX CLOUD GAMING. ALL YOU NEED IS A FREE MICROSOFT ACCOUNT, HIGH-SPEED INTERNET CONNECTION, AND COMPATIBLE DEVICE. ONCE YOU'RE READY, GO TO XBOX.COM/PLAY TO START PLAYING WITH MOBILE TOUCH CONTROLS OR A SUPPORTED CONTROLLER. SEE OUR FAQ BELOW FOR MORE DETAILS.

299.    Fortnite is also available for free on multiple other platforms, including Epic Games, Steam, and PlayStation.

---

[91] Rachel Ehmke, A Parent's Guide to Dealing With Fortnite, Child Mind Institute, https://childmind.org/article/parents-guide-dealing-fortnite/ (last visited Aug. 26, 2024).
[92] Health Experts: Video Game "Fortnite" Can Be Addictive As Heroin, KRON ABC 8 News (Sep. 29, 2018), https://www.wric.com/news/whats-trending/health-experts-video-game-fortnite-can-be- addictive-as-heroin/.
[93] https://www.fortnite.com/mobile/xbox-cloud-gaming.

300.    Fortnite imposes a daily spending limit on minors under 13, however, that limit is $100 per day.[94] A minor under 13 could spend $36,500 on Fortnite in a year without any parental consent or permission.

301.    Guardians can access parental controls to change the automatic restrictions set by Fortnite if their minor is under 13, however, Fortnite only allows a parent to adjust parental controls for any minor account through their minor's account. To engage with/change any parental control settings, the parent must first know that the account exists and subsequently know the log in information for their minor's account.

302.    Fortnite does not provide parental controls regarding screen time, gameplay, and/or usage. Fortnite could, but chooses not to, allow parents to set time limits on their minor's Fortnite account. Fortnite also could, but does not, allow any users to set self-imposed time limits on their Fortnite account.

303.    At account setup, Fortnite's website contains no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from the use of Epic Games' product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

304.    During gameplay, there are no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from the use of Epic Games' product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

305.    Epic Games designed and developed Fortnite games with the use of addictive operant conditioning to make users want to keep using the products more and more.

306.    The team that developed Fortnite includes psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop products that were addictive as possible.

307.    Upon information and belief, Epic Games has licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in Fortnite products.

---

[94] Daily Spending Limits For Players Under 13, Epic Games, https://www.epicgames.com/help/en- US/c-Category_EpicAccount/c-EpicAccounts_ParentalControls/daily-spending-limits-for-players- under-13-a000085524 (last visited Aug. 26, 2024).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

308.    Epic Games does not disclose to the public or the users of Fortnite any of the psychological tactics or addictive features it purposefully incorporates into its products. Instead, Epic Games touts its Fortnite game products as "educational" and markets them for use in the classroom.

309.    On its website, Epic Games even offers "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:[95]



310.    Epic Games joined the Family Online Safety Institute ("FOSI") in 2023, stating they want to "support [FOSI's] work to keep kids safe online." Epic Games' Senior Director of Public Policy represents Epic Games wants to "be on the forefront of creating fun and safe games and experiences for people of all ages," emphasizing its alleged focus on the importance of safety for children playing its games, including Fortnite.[96]

311.    Engaging and addicting users who are minors early and in environments such as their classroom increases Epic Games's revenue through continued use of its Fortnite Products by young users, at the expense of these users' mental and physical health.

312.    Epic Games does not adequately inform, or inform at all, users of the inherent risks involved with using Fortnite game Products, specifically including that Fortnite was designed to addict users to their extreme harm and detriment.

313.

---

[95] Education, Epic Games, https://dev.epicgames.com/documentation/en-us/fortnite- creative/education-in-fortnite-creative (last visited Aug. 26, 2024).
[96] Epic Games Joins the Family Online Safety Institute, FOSI (Nov. 28, 2023), https://www.fosi.org/about-press/epic-games-joins-the-family-online-safety-institute.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

## K.    PLAINTIFF-SPECIFIC ALLEGATIONS

314.    In second grade, Plaintiff Talan Bacalso was evaluated and diagnosed with Attention Deficit Disorder, known commonly known as Attention Deficit Hyperactivity Disorder, or ADHD.

315.    Talan was first introduced to Minecraft by watching friends playing Minecraft. At eight (8) years old, Talan did not yet play Minecraft, but because of the marketing of Minecraft by Microsoft and the wide availability of Minecraft, including on computers at Talan's school, Talan wanted a Minecraft birthday cake and themed party.

316.    On his 10th birthday, Talan received an Xbox console as a gift and immediately began playing Minecraft on his own. He soon began playing Roblox and Fortnite.

317.    Soon Talan's usage of each Defendant's products was compulsive and disordered, and his parents had no ability to monitor his game play time nor were they aware that Talan's behavior was being modified to continue playing games to his detriment.

318.    As a minor child, Talan was lured into continuous Minecraft play through the Xbox platform and the use of Minecraft at school on a school-regulated computer.

319.    The operant conditioning tricks employed by each Defendant were successful in creating a video game addiction which was a substantial factor in Talan's video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

320.    Currently, Plaintiff is a nineteen (19) year old who now has no interest in any activities besides playing Fortnite, Minecraft, and Roblox. Plaintiff becomes irritable when he does not have access to the Products including when he is at school. When Plaintiff is not playing the above referred to games, he is thinking about playing the games constantly. Plaintiff has lost friendships and has used money that was not his to purchase video games. Plaintiff has no ability to control nor decrease his usage of video games despite numerous attempts to do so. Plaintiff has experienced trouble in school, including a drop in grades, which led to his academic dismissal, as a result of his addiction.

321.    Plaintiff was injured and harmed as a direct and proximate result of each Defendant's actions and misconduct, and for that he is entitled to compensation and other damages under California law.

322.    As a minor child, Plaintiff never agreed to be harmed or exposed to an addictive product. Plaintiff never entered into a contract with any of the Defendants, and/or to the extent that any Defendant claims Plaintiff attempted to accept an electronic terms and conditions clause by clicking buttons on a screen which included language Plaintiff did not understand, read, or language which was conscionable, and has been made void by virtue of its unconscionability and the power of disaffirmance. This unconscionability and disaffirmance is demonstrated and secured by the filing of this Complaint.

323.    Specifically, to the extent that any Defendant claims Plaintiff entered into a contract, any terms to which Plaintiff agreed as a child are void and unenforceable. Each Defendant's terms of services or terms and conditions clauses is a contract of adhesion and has no variation or negotiable terms prior to the signing of parties. Further, Plaintiff, as a minor, lacked the capacity to contract, and thus expressly disaffirms any contract he may have made with any of the Defendants when he was a minor, or that Defendants may claim they made with Plaintiff before he reached the age of majority, including but not limited to any arbitration agreements.

324.    Plaintiff's continued use of Defendants' products, to the extent such use exists, is compulsive and due to Plaintiff's addiction to using the products. Plaintiff's continued use does not serve as an affirmation of any potential contract between the parties.

325.    Plaintiff's addiction and damages were established during the years he played these games as a minor before he reached the age of majority. Therefore, he specifically disaffirms any contract or arbitration provision as it relates to the addiction and injuries he suffered as a child, such injuries and damages continuing to this day.

326.    Each Defendant has engaged in deceptive, unfair, immoral, and reckless behavior that led to the injuries sustained by Plaintiff. For this, they should be punished, and punitive damages should be assessed against each Defendant for their respective misdeeds and unlawful conduct.

# V. **PLAINTIFF'S CLAIMS**

## **COUNT I – STRICT PRODUCT LIABILITY – DESIGN DEFECT**

### **(Against All Defendants)**

327.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

328.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game products used by Plaintiff, each of which are defective and unreasonably dangerous due to operant conditioning which assured video game addiction would occur in minors, as well as the lack of necessary safeguards.

329.    The video game products that each Defendant placed into the stream of commerce were defectively designed. The products were designed to cause addictive and compulsive use, including by minors. The products are not reasonably fit, suitable, or safe for their intended purpose of playing a game without suffering from psychological harm as a result of subversive behavioral modification.

330.    The defective conditions of Roblox, Minecraft, and Fortnite rendered it unreasonably dangerous and/or not reasonably safe. The inclusion of operant conditioning to increase continuous game play was concealed from parents, players, and schools. The resulting probability and seriousness of harm was unethical and lacked any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

331.    The defects in each Defendant's respective designs were present in the products when the products left the hands of Defendants and when they were released to the general public to be used in an intended and foreseeable manner with concealment of the operant conditioning.

332.    Roblox, Minecraft, and Fortnite, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, each product's design including addictive operant conditioning

techniques designed to create addiction, each product's design lacking warnings about the risk of addiction, each product's design lacking safeguards such as user-imposed time restrictions on gameplay, each product's design lacking proper minor age verification, and each product failing to operate as a reasonable user would expect.

333.    Neither Plaintiff nor his parents were ever made aware of the fact that operant conditioning was used in Minecraft, Roblox, and Fortnite and did not agree to having such behavior modifications used on Plaintiff. As to any "Use" agreement of playing a video game that any Defendant claims exists with Plaintiff, Plaintiff rejects this argument based upon lack of informed consent to allow operant conditioning to be used on Plaintiff. Plaintiff never consented to be subject to the same subversive behavioral modification techniques used by casinos to increase gameplay and spending.

334.    Each Defendant designed its products to be addictive and take advantage of the concealed use of operant conditioning and the chemical reward system of users' brains to establish compulsive use and addiction.

335.    Each Defendant's respective products were expected to and did reach Plaintiff without substantial change in the condition in which they were designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

336.    Plaintiff used Defendants' respective products, Roblox, Minecraft, and Fortnite, in an intended and reasonably foreseeable manner, and the products were not materially altered prior to their use. Defendants' products reached Plaintiff without substantial change to them.

337.    Each Defendant knew or, by the exercise of reasonable care, should have known that minors, including Plaintiff, would use their products without anyone inspecting the products for addictive or other dangerous features.

338.    Each Defendant's respective products were defective and were a substantial factor in causing Plaintiff's injuries and harm.

339.    Reasonable users of Defendants' products would not expect, and Plaintiff herein did not expect, that said products would pose risks of severe video game addiction and the corresponding sequalae of mood disorders, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance.

340.    Reasonable users of Defendants' products would not expect that Defendants would conceal the operant conditioning, risks of video game addiction, and sequalae of that addiction, but Defendants nevertheless chose to place their products into the stream of commerce while knowing of both the concealment and risk of harm.

341.    Each Defendant could have completely avoided the harm by not utilizing operant conditioning in game design, provided proper game time tracking and a design to limit game play while still providing an optimal gaming experience.

342.    At the time each Defendant's products were designed, developed, distributed to Plaintiff and played by him, safer alternative designs existed that were entirely technologically feasible to implement.

343.    Each Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize harm caused by their respective products by implementing elements that include, but are not limited to:

    a.    warnings of the use of operant conditioning behavior modification systems;

    b.    fully informed consent to operant conditioning behavior modification systems;

    c.    robust age verification mechanisms;

    d.    effective parental controls;

    e.    removal of barriers to the enactment of parental controls;

    f.    warnings as to the health effects of use and extended use upon sign-up;

    g.    opt-in restrictions to the length and frequency of sessions;

    h.    self-limiting tools, including but not limited to session time notifications, warnings, or reports.

    i.    tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

    j.    self-imposed limits for microtransactions; and

    k.    others as set forth herein.

344.   Instead, each Defendant designed their respective products to aggressively addict users with operant conditioning aimed to increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing.

345.   Each Defendant's respective defective product, and Plaintiff's use of each Defendant's product, was the direct and proximate cause of Plaintiff's injuries and harm that include, but are not limited to, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance.

346.   Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the products' design, marketing, distribution, and operation.

347.   As a direct and proximate result of each Defendant's defective products, Plaintiff suffered psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, significant decline in academic performance, which resulted in academic dismissal, and economic loss.

348.   Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT II – STRICT PRODUCT LIABILITY – FAILURE TO WARN

### (Against All Defendants)

349.   Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

350.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game products used by Plaintiff, each of which are defective and unreasonably dangerous due to operant

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

conditioning built in games to ensure continuous video game play leading to video game addiction and the sequalae of that addiction.

351.    Defendants knew that their respective products concealed the built-in operant conditioning rendering the games unreasonably dangerous, harmful, capable of causing and in fact were designed to cause compulsive, addictive use, particularly in minors, and that such use could result in severe physical, mental, and emotional injuries.

352.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks of their products nor be capable of knowing that operant conditioning was being used on players in the games.

353.    Defendants knew, or should have known, that the use of Roblox, Minecraft, and Fortnite was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

354.    Each Defendant owed a duty to warn consumers of the foreseeable risks and dangers of their respective products that Defendants knew were present, but not obvious or known to users, especially underage users, or their caregivers, or any average member of the consuming public.

355.    At the time Defendants' products left Defendants' control, they did not include – nor have they ever included – warnings that the products pose an unreasonable risk of harm to users, particularly minors. The inclusion of operant conditioning to increase continuous game play was concealed from parents, players, and schools. The resulting probability and seriousness of harm was unethical and lacks any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

356.    Each Defendant failed to provide timely and adequate warnings, instructions, and information by, including but not limited to:

   a.   failing to warn Plaintiff of the use of operant conditioning behavior modification systems;

   b.   failing to obtain from Plaintiff informed consent to operant conditioning in the games;

c.  failing to warn Plaintiff, his parents and his schools that operant conditioning was used in the games;

d.  failing to ensure the products included warnings regarding their addictive design that were accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with their use;

e.  failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to Plaintiff;

f.  failing to include adequate and conspicuous warnings that would alert Plaintiff or his parents to the dangerous risks of the products, including but not limited to the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors in minors, especially those with neurodivergent qualities;

g.  failing to issue warnings to consumers like Plaintiff regarding the dangerous risks of the products even after the sale and/or download of their products; and

h.  representing that the products were and are safe for use, when in fact, Defendants knew or should have known that their products were designed to cause minors like Plaintiff to engage in excessive use until they developed an addiction or disordered compulsion to use the products.

357.  Moreover, each Defendant's non-feasance, failure to act, and omissions in the development, set up, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of their respective products rendered the product unreasonably dangerous. Those failures include but are not limited to:

a.  incorporating operant conditioning into the infrastructure of game play to reward continuous video game play;

b.  designing the products to be more addictive and to target specific individuals based on information obtained and retained by Defendants and/or third parties;

c.  failing to implement effective parental controls;

d.  failing to implement reasonably available means for users or their parents to monitor for and limit or deter their own excessive frequency or duration of use of products,

including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

e.  failing to implement reasonably available means to monitor for and limit or deter excessive overspending by minors on in-game downloadable products and upgrades and in-game purchases and/or microtransactions; and

f.  failing to implement reasonably available means to allow users or their parents to limit or deter use of products by minors during ordinary times for school or sleep.

358.    Each Defendant's failure to adequately warn about its defective product created a danger of injuries described herein that were reasonably foreseeable at the time of the design, development, and dissemination of the product.

359.    A reasonable company under the same or similar circumstances would have warned and instructed Plaintiff or his parents of the dangers of its product.

360.    Had Plaintiff or his parents been aware that the products could cause significant harm including an increased risk of suicide, Plaintiff's parents would not have allowed Plaintiff to use or continue to use each Defendant's respective product. Likewise, Plaintiff would not have used or continued to use Defendants' products. Alternatively, if Defendants had adequately warned or instructed Plaintiff or Plaintiff's parents, they would have taken precautions when using each Defendant's respective product in order to eliminate or mitigate the risk of harm.

361.    The addictive nature of each Defendant's defective product and failure to warn about said product actually and proximately caused Plaintiff's video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

362.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT III – NEGLIGENCE – DESIGN

### (Against All Defendants)

363.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

364.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game products used by Plaintiff, each of which are defective and unreasonably dangerous.

365.    Defendants knew, or should have known, that the use of Roblox, Minecraft, and Fortnite was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

366.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Roblox, Minecraft, and Fortnite.

367.    Each Defendant owed a duty to all reasonably foreseeable users to design a safe product.

368.    Roblox, Minecraft, and Fortnite, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, each product's design including addictive operant conditioning, each product's design lacking warnings about the risk of addiction, each product's design lacking safeguards such as user-imposed time restrictions on gameplay, each product's design lacking proper minor age verification, and each product failing to operate as a reasonable user would expect.

369.    Defendants breached their duty by failing to use reasonable care in the design of their products by negligently designing Roblox, Minecraft, and Fortnite to specifically appeal to and to take advantage of minors, who were particularly unable to appreciate the risks of the products.

370.    Defendants breached their duty by failing to use cost effective, reasonably feasible alternative designs that would make their products less addictive and harmful to minors, including but not limited to:

        a.    warnings of the use of operant conditioning behavior modification systems;

        b.    fully informed consent to operant conditioning behavior modification systems;

        c.    robust age verification mechanisms;

d.    effective parental controls;

e.    removal of barriers to the enactment of parental controls;

f.    warnings as to the health effects of use and extended use upon sign-up;

g.    opt-in restrictions to the length and frequency of sessions;

h.    self-limiting tools, including but not limited to session time notifications, warnings, or reports.

i.    tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

j.    self-imposed limits for microtransactions; and

k.    others as set forth herein.

371.    Instead, each Defendant designed their respective products to aggressively addict users with features that increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing.

372.    A reasonable company under the same or similar circumstances would have designed a safer product.

373.    Plaintiff was harmed directly and proximately by each Defendant's failure to use reasonable care in the design of its product.

374.    As a direct and proximate result of each Defendant's negligence, Plaitniff suffered video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

375.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

## COUNT IV -NEGLIGENT FAILURE TO WARN

### (Against All Defendants)

376.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

377.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and/or benefited from the products and platforms that Plaintiff used.

378.    Defendants knew, or should have known, that the use of their products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

379.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable considering each Defendants' own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Plaintiff.

380.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendants' products. Minecraft, Roblox, and Fortnite are highly addictive and likely to cause physical, mental, and emotional injuries as listed above.

381.    None of Defendants' products, as identified herein, contain a warning, nor have they ever contained a warning, that their products contained operant conditioning to elicit continuous video game play which poses an unreasonable risk of harm and addiction to users, particularly minors. Defendants' products did not contain a warning when the products left their possession.

382.    Had Plaintiff and/or Plaintiff's parents received adequate warning about the risks of Defendants' products, Plaintiff and/or Plaintiff's parents would have heeded such warnings.

383.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product in a manner which the manufacturer should reasonably foresee.

384.    Defendants breached their duties owed to foreseeable users. That breach includes a failure to warn users that Defendants' respective products cause addiction, compulsive use, and/or other physical, mental, emotional, and developmental delay injuries, including an increased risk of suicidality.

385.    A reasonable company under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers, and parents of minor consumers.

386.    As a direct and proximate result of Defendants' breach of duty to provide adequate warnings, Plaintiff was harmed and sustained the injuries set forth herein.

387.    As a direct and proximate result of each Defendant's material misrepresentation and false statements, Plaintiff suffered video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

388.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT V – INTENTIONAL MISREPRESENTATION

### (Against All Defendants)

389.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

390.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game products used by Plaintiff, each of which are defective and unreasonably dangerous due to operant conditioning which ensured continuous video game play and increased the risk of video game addiction.

391.    Defendants knew, or should have known, that the use of their respective products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

392.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable considering each Defendant's own internal information and knowledge regarding its product at the time of the product's development, design, marketing, promotion, advertising, and distribution to Plaintiff. The

inclusion of operant conditioning to increase continuous game play was concealed from parents, players, and schools. The resulting probability and seriousness of harm was unethical and lacked any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

393.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendants' products.

394.    At the time each Defendant's product left their respective control, the products did not include – nor has they ever included – warnings that the products pose an unreasonable risk of harm to users, particularly minors.

395.    Had Plaintiff or Plaintiff's parents been aware that the products could cause significant harm, Plaintiff's parents would not have purchased or allowed Plaintiff to use or continue to use each Defendant's respective product. Likewise, Plaintiff would not have used or continued to use each Defendant's product. Alternatively, if Defendants had adequately warned or instructed Plaintiff and/or Plaintiff's parents, they would have taken precautions when using each Defendant's respective product in order to eliminate or mitigate the risk of harm.

396.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product in a manner which the manufacturer should reasonably foresee.

397.    Defendants breached their duties owed to foreseeable users. That breach includes a failure to warn users that Defendants' respective products cause addiction, compulsive use, and/or other physical and mental injuries.

398.    A reasonable company under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers, and parents of minor consumers.

399.    As a direct and proximate result of each Defendant's breach of duty to provide adequate warnings, Plaintiff was harmed and sustained the injuries set forth herein.

400.    As a direct and proximate result of each Defendant's negligence, Plaintiff suffered psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

401.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

### COUNT VI – NEGLIGENCE – ORDINARY

### (Against All Defendants)

402.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

403.    Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, including Plaintiff.

404.    Defendants, in their role as product designers, developers, manufacturers, marketers, and sellers, and otherwise engaging in activity culminating in placing their products into the stream of commerce, owed a duty to exercise ordinary care in designing and placing the products into the stream of commerce. The inclusion of operant conditioning to increase continuous game play was concealed from parents, players, and schools. The resulting probability and seriousness of harm was unethical and lacked any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

405.    Defendants also owed a duty to warn users of the hazards of using their products, which Defendants knew were present in their products, though such hazards were not obvious to users and particularly not so to minor users.

406.    Defendants' duties also include a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

407.    Each Defendant created harmful and addictive products and failed to engage in the development of safer alternative designs.

408.    For their own profit, each Defendant affirmatively chose not to engage in the development of a safer alternative designs.

409.    Each Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care.

410.    Defendants' failure to act in developing a safer alternative designs constitutes a breach of their duty of reasonable care.

411.    Defendants knew, or should have known, that their products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

412.    Defendants were and are negligent in failing to provide adequate warnings about the dangers associated with using their products and in failing to warn users, and the parents of users who are minors, including Plaintiff, about how and when, if ever, to safely use their products.

413.    Defendants were and are negligent in failing to provide users, and their caregivers in the case of users who are minors, including Plaintiff, the tools to ensure that their products are used in a limited and safe manner.

414.    As a result of each Defendant's breach of the herein identified duties and resulting negligence, Plaintiff suffered from injuries and damages from his video game addiction, including physical, psychological, and economic harm.

415.    Each Defendant's breach of duty of care to Plaintiff was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

416.    As a direct and proximate result of each Defendant's negligence, Plaintiff suffered significant video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical

outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

417.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT VII – INTENTIONAL MISREPRESENTATION

### (Against All Defendants)

418.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

419.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game products used by Plaintiff, each of which are defective and unreasonably dangerous due to the concealment of operant conditioning being used in Minecraft, Roblox, and Fortnite and the lack of warnings about the risk of addiction.

420.    As detailed herein, Defendants knew about the defective conditions of their respective products and that the products posed serious health risks to users, particularly minors.

421.    Each Defendant designed their respective products with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and product users, including Plaintiff.

422.    Each Defendant knew of the risks associated with the use of their respective products based on internal research and external studies known within the industry.

423.    Each Defendant could have disclosed the defective condition of their respective products to the public and could have advised that the products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices. The inclusion of operant conditioning to increase continuous game

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

play was concealed from parents, players, and schools. The resulting probability and seriousness of harm was unethical and lacked any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

424.    Each Defendant knowingly and intentionally misrepresented that their respective products were safe for use, and safe as educational tools, to further entice users to continue engaging with their respective products, including Plaintiff, while simultaneously knowing that their respective products each caused addiction and compulsive use.

425.    Defendants Microsoft and Mojang stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone." Defendants Microsoft and Mojang further state that it is "so important that [their] games are a safe and welcoming place for all players," that "player safety is a priority for Mojang to ensure everyone feels safe," and that their "community standards help [them] build a community that is open and safe for everyone."

426.    Defendants' statements about the safety of their respective products are false and misleading, and each Defendant's omission of the potential harm caused by Defendants' respective products is misleading and deceitful.

427.    Each Defendant intended for users, including Plaintiff, to rely on their representations that their respective products were safe for use to keep users engaging with their products and increase their profits, and purposefully marketed their products to minors for that reason. Each Defendant's representations about safety were material in keeping users engaged with their products and to increase their profits.

428.    However, each Defendant had no reasonable grounds to believe that their respective products were safe given the internal and external research on addiction associated with video game use and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective products.

429.    Each Defendant failed to disclose to users, including Plaintiff, that their products are designed to create and sustain addiction.

430.    Each Defendant intentionally failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

431.    Each Defendant intentionally failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

432.    If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their products, and had Plaintiff and/or Plaintiff's parents been aware that the products could cause significant harm such as increased risk of suicide, brain damage, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Plaintiff's parents would not have allowed Plaintiff to use or continue to use each Defendant's respective product. Likewise, Plaintiff would not have used or continued to use Defendants' products. Alternatively, if Defendants had adequately warned or instructed Plaintiff's parents and/or Plaintiff, they would have taken precautions when using each Defendant's respective product in order to eliminate or mitigate the risk of harm.

433.    Plaintiff and Plaintiff's parents were unaware of the dangerous and addictive nature of Defendants' products. Plaintiff reasonably relied on each Defendant's representations that its respective product was safe for use, particularly for minors.

434.    Plaintiff and Plaintiff's parents reasonably relied on each Defendant's representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' products.

435.    A reasonable person, including Plaintiff and Plaintiff's parents, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' products – to be important when deciding whether to purchase, download, use, or to continue to use, those products. Thus, Plaintiff and Plaintiff's parents justifiably relied on each Defendant's misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

436.    Because of Plaintiff's and Plaintiff's parents' reasonable reliance on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as economic damages.

437.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff suffered video game addiction, psychological injury, emotional distress,

diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

438.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT VIII – NEGLIGENT MISREPRESENTATION

### (Against All Defendants)

439.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

440.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game products used by Plaintiff, each of which are defective and unreasonably dangerous due to the concealment of operant conditioning being used in Minecraft, Roblox, and Fortnite with the behavior goal of continuous video game play and increased risk of video game addiction.

441.    As detailed herein, Defendants knew about the defective conditions of their respective products and that the products posed serious health risks to users, particularly minors.

442.    Each Defendant designed their respective products with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and product users, including Plaintiff.

443.    Defendants knew of the risks associated with the use of their products based on internal research and external studies known within the industry.

444.    Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any

2  disclosures of marketing practices.

3      445.    Defendants knowingly and intentionally misrepresented that their products were safe for

4  use, and safe as an educational tool, to further entice users to continue engaging with their products,

5  including Plaintiff, while simultaneously knowing that their respective products each caused addiction

6  and compulsive use.

7      446.    Defendants Microsoft and Mojang stated that they will "hold [them]selves accountable

8  for making Minecraft as safe as possible for everyone." Defendants Microsoft and Mojang further state

9  that it is "so important that [their] games are a safe and welcoming place for all players," that "player

10  safety is a priority for Mojang to ensure everyone feels safe," and that their "community standards help

11  [them] build a community that is open and safe for everyone."

12      447.    Each Defendant's statements about the safety of their respective products are false and

13  misleading, and each Defendant's omission of the potential harm caused by Defendants' respective

14  products is misleading and deceitful.

15      448.    Each Defendant intended for users, including Plaintiff, to rely on their representations

16  that their respective products were safe for use to keep users engaging with their products and increase

17  their profits, and purposefully marketed their products to minors for that reason. Each Defendant's

18  representations about safety were material in keeping users engaged with their products and to increase

19  their profits.

20      449.    However, each Defendant had no reasonable grounds to believe that their respective

21  products were safe given the internal and external research on addiction and given the global recognition

22  of video game addiction. Each Defendant made false statements about the safety of their respective

23  products.

24      450.    Defendants failed to disclose to users, including Plaintiff, that their products are designed

25  to create and sustain addiction.

26      451.    Defendants failed to disclose to users the strategies and features designed and employed

27  in their products to create and sustain addiction.

28

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

452. Defendants failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

453. If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their products, and had Plaintiff and/or Plaintiff's parents been aware that the products could cause significant harm such as brain damage, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, increased suicide risk and behavioral addiction disorders, Plaintiff's parents would not have allowed Plaintiff to use or continue to use each Defendant's respective product. Likewise, Plaintiff would not have used or continued to use Defendants' products. Alternatively, if Defendants had adequately warned or instructed Plaintiff's parents and/or Plaintiff, they would have taken precautions when using each Defendant's respective product in order to eliminate or mitigate the risk of harm.

454. Plaintiff and Plaintiff's parents were unaware of the dangerous and addictive nature of Defendant's products. Plaintiff and Plaintiff's parents reasonably relied on Defendant's representations that its products were safe for use, particularly for minors.

455. Plaintiff and Plaintiff's parents reasonably relied on Defendants' representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' products.

456. A reasonable person, including Plaintiff and Plaintiff's parents, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' products – to be important when deciding whether to purchase, download, use, or to continue to use, those products. Thus, Plaintiff and Plaintiff's parents justifiably relied on each Defendant's misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

457. Because of Plaintiff's and Plaintiff's parents' reasonable reliance on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as damages.

458. Defendants' misrepresentations were a substantial factor in causing harm to Plaintiff, who suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Thus, Plaintiff seeks actual damages according to proof.

**COUNT IX – FRAUD**

**(Against All Defendants)**

448.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if repeated in full here.

449.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game products used by Plaintiff each of which are defective and unreasonably dangerous due to concealment of operant conditioning being used in Roblox, Minecraft, and Fortnite to increase the chances of continuous video game play and thereby also increased the chance of video game addiction.

450.    As detailed herein, each Defendant knew about the defective conditions of its products and that the products posed serious health risks to users, particularly minors, young adults, and neurodivergent individuals.

451.    Each Defendant knew their products posed risks to minors, like Plaintiff, based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like Plaintiff, to purchase/download the game and to continue using Defendants' products and encourage the addiction knowingly caused by Defendants' products.

452.    Defendants Microsoft and Mojang stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone." Defendants Microsoft and Mojang further state that it is "so important that [their] games are a safe and welcoming place for all players," that "player safety is a priority for Mojang to ensure everyone feels safe," and that their "community standards help [them] build a community that is open and safe for everyone."

453.    Each Defendant's statements about the safety of their respective products are false and misleading, and each Defendant's omission of the potential harm caused by Defendants' respective products is misleading and deceitful.

454.    Each Defendant could have disclosed the defective condition of their products to the public and could have advised that the products posed serious health risks to users, particularly youth.

-77-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1 No Defendant took such action; instead, each Defendant opted to omit the safety risks from any
2 disclosures or marketing practices.

3      455.    Defendants knowingly and intentionally misrepresented that their products were safe for
4 use to further entice users to continue engaging with their products, including Plaintiff.

5      456.    Each Defendant intended for users, including Plaintiff and Plaintiff's parents, to rely on
6 their representations that their respective products were safe for use to keep users engaging with their
7 products and increase their profits, and purposefully marketed their products to minors for that reason.
8 Each Defendant's representations about safety were material in keeping users engaged with their
9 products and to increase their profits.

10     457.    If each Defendant had not concealed, omitted, and misrepresented facts regarding the
11 safety of their products, and had Plaintiff and/or Plaintiff's parents been aware that the products could
12 cause continuous video game play resulting in significant harm such as video game addiction and the
13 attendant sequalae of lack of prefrontal cortex development in the brain, psychological injury, emotional
14 distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such
15 as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and
16 significant decline in academic performance, which resulted in academic dismissal, Plaintiff's parents
17 would not have purchased or allowed Plaintiff to use or continue to use each Defendant's respective
18 products. Likewise, Plaintiff would not have used or continued to use Defendants' products.
19 Alternatively, if Defendants had adequately warned or instructed Plaintiff and /or Plaintiff's parents,
20 they would have taken precautions when using each Defendant's respective product in order to eliminate
21 or mitigate the risk of harm.

22     458.    However, each Defendant had no reasonable grounds to believe that their respective
23 products were safe given the internal and external research on addiction and given the global recognition
24 of video game addiction. Each Defendant knowingly made false statements about the safety of their
25 respective products.

26     459.    As a direct and proximate result of each Defendant's material omissions, Plaintiff and
27 Plaintiff's parents had no reason to believe that each of Defendant's products were unsafe for children
28 to use.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

460.    Plaintiff and Plaintiff's parents reasonably relied on each Defendant's misrepresentations that each of their products was safe for use.

461.    A reasonable person, including Plaintiff and Plaintiff's parents, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' products – to be important when deciding whether to purchase, download, use, or to continue to use, those products. Thus, Plaintiff and Plaintiff's parents justifiably relied on each Defendant's misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

462.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff suffered video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

463.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT X – STRICT PRODUCT LIABILITY – DESIGN DEFECT

### (Against Defendant Microsoft in its capacity as the manufacturer of the Xbox Platform)

464.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated here in full.

465.    At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing the Xbox Product used by Plaintiff, which is defective and unreasonably dangerous due to its inclusion of operant condition behavior modification techniques and it's the concealment of operant conditioning in Minecraft, Roblox, and Fortnite, which was utilized to elicit continuous video game play which resulted in video game addiction and the sequalae that goes with video game addiction.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

466.    The product Defendant placed into the stream of commerce was defectively designed.

467.    The product was designed to cause addictive and compulsive use, including by minors. The product is not reasonably fit, suitable, or safe for its intended purpose.

468.    The defective condition of the Xbox product rendered it unreasonably dangerous and/or not reasonably safe. The probability and seriousness of harm caused by the respective products outweighs the burdens of taking precautions to remedy the dangers of each Defendant's respective designs.

469.    The defects in the product were present in the product when it left the hands of Defendant and when it was released to the general public to be used in an intended and foreseeable manner.

470.    Defendant's product, as designed, was unreasonably dangerous, posed a substantial likelihood of harm, and was therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, the product's design including addictive operant conditioning, the product's design lacking warnings about the risk of addiction, the product's design lacking safeguards such as easily available user-imposed time restrictions on gameplay, the product's design lacking proper minor age verification, and the product failing to operate as a reasonable user would expect.

471.    Defendant designed its product to be addictive and take advantage of the chemical reward system of users' brains to establish compulsive use and addiction.

472.    Defendant's product was expected to and did reach Plaintiff without substantial change in the condition in which it was designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

473.    Plaintiff used Defendant's product in an intended and reasonably foreseeable manner, and the product was not materially altered prior to its use. Defendant's product reached Plaintiff without substantial change to it.

474.    Defendant knew or, by the exercise of reasonable care, should have known that minors, including Plaintiff, would use its product without anyone inspecting the product for addictive or other dangerous features.

475.    Reasonable users of Defendant's product would not expect, and Plaintiff and Plaintiff's parents herein did not expect, that said product would pose risks of severe physical and mental harm.

476.    Reasonable users of Defendant's product would not expect that Defendant knew about risks of severe physical and mental harm and nevertheless chose to place its product into the stream of commerce.

477.    Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing its product without the harm causing features listed above while still providing an optimal gaming experience.

478.    At the time Defendant's product was designed, developed, distributed to Plaintiff, and played, safer alternative designs existed that were entirely feasible.

479.    Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize harm caused by its product by implementing elements that include, but are not limited to:

      a.    warnings of the use of operant conditioning behavior modification systems;

      b.    fully informed consent to operant conditioning behavior modification systems;

      c.    robust age verification mechanisms;

      d.    effective parental controls;

      e.    removal of barriers to the enactment of parental controls;

      f.    warnings as to the health effects of use and extended use upon sign-up;

      g.    opt-in restrictions to the length and frequency of sessions;

      h.    self-limiting tools, including but not limited to session time notifications, warnings, or reports.

      i.    tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

      j.    self-imposed limits for microtransactions; and

      k.    others as set forth herein.

480.    Instead, Defendant designed its product to aggressively addict users with features that increase use time, frequency of use, and profit to Defendant, all to the detriment of users' wellbeing.

481.    Defendant's defective product, and Plaintiff's use of Defendant's defective product, were the direct and proximate cause of Plaintiff's injuries and harm that include, but are not limited to, video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression,

2  anxiety, damage to interpersonal relationships, and significant decline in academic performance, which

3  resulted in academic dismissal.

4  482.    Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to

5  Defendant at the time of the product's design, marketing, and operation.

6  483.    As a direct and proximate result of Defendant's defective product, Plaintiff suffered from

7  video game addiction, psychological injury, emotional distress, diminished social interactions, lack of

8  interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts,

9  depression, anxiety, damage to interpersonal relationships, and significant decline in academic

10  performance, which resulted in academic dismissal.

11  484.    Defendant's actions and omissions as alleged in this Complaint were intentional,

12  oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard

13  for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus,

14  Plaintiff seeks actual and punitive damages according to proof.

15  **COUNT XI – STRICT PRODUCT LIABILITY – FAILURE TO WARN**

16  **(Against Defendant Microsoft in its capacity as the manufacturer of the Xbox Platform)**

17  485.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every

18  paragraph of this Complaint as if repeated here in full.

19  486.    At all relevant times, Defendant was engaged in the business of designing, developing,

20  managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting,

21  controlling, supplying, leasing, selling, and/or otherwise distributing the Xbox Product used by Plaintiff,

22  which is defective and unreasonably dangerous due to its inclusion of operant condition behavior

23  modification techniques and it's the concealment of operant conditioning in Minecraft, Roblox, and

24  Fortnite, which was utilized to elicit continuous video game play which resulted in video game addiction

25  and the sequalae that goes with video game addiction.

26  487.    Defendant knew that its product was and is harmful, capable of causing and in fact was

27  designed to cause compulsive, addictive use, particularly in minors, and that such use could result in

28  severe physical, mental, and emotional injuries.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

488.    Defendant knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks of the product.

489.    Defendant knew, or should have known, that the use of its product was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

490.    Defendant owed a duty to warn consumers of the foreseeable risks and dangers of the product that the Defendant knew were present but not obvious or known to users, especially underage users, or their caregivers, or any average member of the consuming public.

491.    At the time Defendant's product left Defendant's control, it did not include – nor has it ever included – a warning that the product poses an unreasonable risk of harm to users, particularly minors.

492.    Defendant failed to provide timely and adequate warnings, instructions, and information by, including but not limited to:

    a.  failing to obtain Informed Consent and Warning to users, parents and teachers that operant conditioning was being used to elicit the behavior of continuous video game play;

    b.  failing to ensure the product included warnings regarding its addictive design that were accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with its use;

    c.  failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to users;

    d.  failing to include adequate and conspicuous warnings that would alert users to the dangerous risks of the product, including but not limited to the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors in minors, especially those with neurodivergent qualities;

    e.  failing to issue warnings to consumers regarding the dangerous risks of the product even after its purchase; and

    f.  representing that the product was and is safe for use, when in fact, Defendant knew or should have known that its product was designed to cause minors to engage in

1   excessive use until they developed an addiction or disordered compulsion to use the
2   product.

3   493.    Moreover, Defendant's non-feasance, failure to act, and omissions in the development,
4   setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control
5   of its product rendered the product unreasonably dangerous. Those failures include but are not limited
6   to:

7       a.  designing the product to be more addictive with the concealed deployment of operant
8           conditioning and targeting specific individuals based on information obtained and
9           retained by Defendant and/or third-parties;

10      b.  failing to implement effective parental controls;

11      c.  failing to implement reasonably available means for users or their parents to monitor
12          for and limit or deter their own excessive frequency or duration of use of the product,
13          including patterns, frequency, or duration of use that are indicative of addiction,
14          compulsive use, or overuse; and

15      d.  failing to implement reasonably available means to set an overall spending limit for
16          minors on downloadable content on the Xbox Product.

17  494.    Defendant's failure to adequately warn about its defective product created a danger of
18  injuries described herein that were reasonably foreseeable at the time of the design, development, and
19  dissemination of the Product.

20  495.    A reasonable company under the same or similar circumstances would have warned and
21  instructed Plaintiff of these dangers of its product.

22  496.    Had Plaintiff and/or Plaintiff's parents been aware that the product could cause significant
23  harm such as brain damage, psychological injury, aggressive behavior, verbal memory deficiency,
24  depression, lowered cognitive abilities, sleeping disorders, anxiety, increased risk of suicide and
25  behavioral addiction disorders, Plaintiff's parents would not have purchased or allowed Plaintiff to use
26  or continue to use Defendant's product. Likewise, Plaintiff would not have used or continued to use
27  Defendant's product. Alternatively, if Defendant had adequately warned or instructed Plaintiff's and/or

28

-84-
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Plaintiff, they would have taken precautions when using Defendant's product in order to eliminate or mitigate the risk of harm.

497.    The addictive nature of Defendant's defective Product and failure to warn about said product proximately caused Plaintiff's significant addiction, emotional injury, suicide and economic loss.

498.    Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT XII – NEGLIGENCE – DESIGN

### (Against Defendant Microsoft in its capacity as the manufacturer of the Xbox Platform)

499.    Plaintiff. realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

500.    At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing the Xbox Product used by Plaintiff, which is defective and unreasonably dangerous due to its inclusion of operant condition behavior modification techniques and it's the concealment of operant conditioning in Minecraft, Roblox, and Fortnite, which was utilized to elicit continuous video game play which resulted in video game addiction and the sequalae that goes with video game addiction.

501.    Defendant knew, or should have known, that the use of its product was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

502.    Defendant knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of its product.

503.    Defendant owed a duty to all reasonably foreseeable users to design a safe product.

504.    Defendant's product as designed was unreasonably dangerous, posed a substantial likelihood of harm, and was therefore defective because of the reasons enumerated in this Complaint, including, but not limited to the creation of a product that does not obtain informed consent for the use

of operant conditioning on gamers nor did defendants provide a warning that operant conditioning was being used in the products, nor did they contain warnings about the potential harm of use, the creation of a product without proper minor age verification, and because the product created failed to operate as a reasonable user would expect.

505.    Defendant breached its duty by failing to use reasonable care in the design of its product by negligently designing its product to specifically appeal to minors, who were particularly unable to appreciate the risks of the product.

506.    Defendant breached its duty by failing to use cost-effective, reasonably feasible alternative designs that would make the product less harmful to minors, including but not limited to:

    a.    failure to include warnings of the use of operant conditioning behavior modification systems;

    b.    failure to obtain fully informed consent to operant conditioning behavior modification systems;

    c.    failure to create robust age verification mechanisms;

    d.    failure to create effective parental controls;

    e.    failure to remove barriers to the enactment of parental controls;

    f.    failure to provide warnings as to the health effects of use and extended use upon sign-up;

    g.    failure to implement opt-in restrictions to the length and frequency of sessions;

    h.    failure to create self-limiting tools, including but not limited to session time notifications, warnings, or reports.

    i.    failure to create tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

    j.    failure to create self-imposed limits for microtransactions; and

    k.    others as set forth herein.

507.    Defendant breached its duty by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harm to users, especially youth. Instead,

-86-
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Defendant designed a product that increased addictiveness, use time, frequency of use, and engagement with the product.

508.    A reasonable company under the same or similar circumstances would have designed a safer product and would not have concealed the operant conditioning.

509.    Plaintiff was harmed directly and proximately by the Defendant's failure to use reasonable care in the design of its product.

510.    As a direct and proximate result of Defendant's negligence, Plaintiff suffered significant injury, harm, damages, and economic loss, and Plaintiff will continue to suffer resulting harm and damages.

511.    Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT XIII – NEGLIGENCE – FAILURE TO WARN

**(Against Defendant Microsoft in its capacity as the manufacturer of the Xbox Platform)**

523.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

524.    At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing the Xbox Product used by Plaintiff, which is defective and unreasonably dangerous due to its inclusion of operant condition behavior modification techniques and it's the concealment of operant conditioning in Minecraft, Roblox, and Fortnite, which was utilized to elicit continuous video game play which resulted in video game addiction and the sequalae that goes with video game addiction.

525.    Defendant knew, or should have known, that the use of Defendant's product was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

526.    Defendants knew or, by the exercise of reasonable care should have known, that its product posed risks of harm to youth, like Plaintiff. These risks were known and knowable considering

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1 Defendant's own internal information and knowledge regarding its product at the time of the product's

2 development, design, marketing, promotion, advertising, and distribution to Plaintiff.

3    527.    Defendant knew, or should have known, that ordinary consumers such as Plaintiff would

4 not have realized the potential risks and dangers of Defendant's product.

5    528.    Defendant's product, as identified herein, does not contain a warning, nor has it ever

6 contained a warning that its product poses an unreasonable risk of harm to users, particularly minors.

7 Defendant's product did not contain a warning of these risks when the product left its possession.

8    529.    Had Plaintiff and/or Plaintiff's parents been aware that the product could cause significant

9 harm such as brain damage, psychological injury, aggressive behavior, verbal memory deficiency,

10 depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders,

11 Plaintiff's parents would not have purchased or allowed Plaintiff to use or continue to use Defendant's

12 Product. Likewise, Plaintiff would not have used or continued to use Defendant's product. Alternatively,

13 if Defendant had adequately warned or instructed Plaintiff's parents and/or Plaintiff, they would have

14 taken precautions when using Defendant's product in order to eliminate or mitigate the risk of harm.

15    530.    Defendant had a duty to give reasonable and adequate warnings of dangers inherent or

16 reasonably foreseeable in the use of its product in a manner which the manufacturer should reasonably

17 foresee.

18    531.    Defendant breached its duty owed to foreseeable users. That breach includes a failure to

19 warn users that Defendant's product causes compulsive use and/or other physical and mental injuries.

20    532.    A reasonable company under the same or similar circumstances would have used

21 reasonable care to provide adequate warnings to consumers, and parents of minor consumers.

22    533.    As a direct and proximate result of Defendant's breach of duty to provide adequate

23 warnings, Plaintiff was harmed and sustained the injuries set forth herein.

24    534.    As a direct and proximate result of Defendant's negligence, Plaintiff suffered

25 psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies,

26 and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to

27 interpersonal relationships, and significant decline in academic performance, which resulted in academic

28 dismissal, and economic loss.

535.   Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT XIV– NEGLIGENCE – ORDINARY

**(Against Defendant Microsoft in its capacity as the manufacturer of the Xbox Platform)**

536.   Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

537.   Defendant, in its role as a product designer, developer, manufacturer, marketer, and seller, and otherwise engaging in activity culminating in placing its product into the stream of commerce, owed a duty to exercise ordinary care in designing and placing the product into the stream of commerce.

538.   Defendant also owed a duty to warn users of the hazards of using its product, which Defendant knew were present in its product, though such hazards were not obvious to users and particularly not so to minor users.

539.   Defendant's duties also include a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

540.   Defendant created a harmful and addictive product and failed to engage in the development of a safer alternative design.

541.   For its own profit, Defendant chose not to engage in the development of a safer alternative design.

542.   Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care.

543.   Defendant's failure to act in developing a safer alternative design constitutes a breach of its duty of reasonable care.

544.   Defendant knew, or should have known, that its product is harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

545.     Defendant was and is negligent in failing to provide adequate warnings about the dangers associated with using its product and in failing to warn users, and the parents of users who are minors, including Plaintiff, about how and when, if ever, to safely use its product.

546.     Defendant was and is negligent in failing to adequately provide users, and their caregivers in the case of minor users, including Plaintiff, with the tools to ensure that its product is used in a limited and safe manner.

547.     As a result of Defendant's breach of the herein identified duties and resulting negligence, Plaintiff suffered severe physical and mental harm, as well as economic damages, from Plaintiff's use of Defendant's product.

548.     Defendant's breach of duty of care to Plaintiff was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

549.     As a direct and proximate result of Defendant's negligence, Plaintiff suffered significant injury, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal, and Plaintiff suffered resulting damages.

550.     Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

**COUNT XV – INTENTIONAL MISREPRESENTATION**

**(Against Defendant Microsoft in its capacity as the manufacturer of the Xbox Platform)**

551.     Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

552.     At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing the Xbox Product used by Plaintiff, which is defective and unreasonably dangerous due to its inclusion of operant condition behavior

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

modification techniques and it's the concealment of operant conditioning in Minecraft, Roblox, and Fortnite, which was utilized to elicit continuous video game play which resulted in video game addiction and the sequalae that goes with video game addiction.

553.    As detailed herein, Defendant knew about the defective conditions of its product and that the product posed serious health risks to users, particularly minors.

554.    Defendant designed its product with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and product users, including Plaintiff.

555.    Defendant knew of the risks associated with the use of its product based on internal research and external studies known within the industry.

556.    Defendant could have disclosed the defective condition of its product to the public and could have advised that the product posed serious health risks to users, particularly youth. Defendant took no such action; instead, Defendant opted to omit the safety risks from any disclosures.

557.    Defendant knowingly and intentionally misrepresented that its product was safe for use to further entice users to purchase and continue engaging with its product, including Plaintiff, while simultaneously knowing that its product caused addiction and compulsive use.

558.    Defendant stated that "Xbox strives to create a safer gaming experience for you and your family," and that its Xbox Store is "safer for the whole family" to use. Defendant also stated that it "hold[s] [itself] accountable for making [its] platforms as safe as possible for all players" and it "will promote the availability of our safety tools through our platforms, support channels, services, on our websites and in retail stores to reach more players and parents."

559.    Defendant's statements about the safety of its product are false and misleading, and Defendant's omission of the potential harm caused by its product is misleading and deceitful.

560.    Defendant intended for users, including Plaintiff, to rely on its representations that its product was safe for use to keep users engaging with its product and increase its profits, and purposefully marketed its product to minors for that reason. Defendant's representations about safety were material in keeping users engaged with its product and to increase its profits.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

561.    However, Defendant had no reasonable grounds to believe that its product was safe given the internal and external research on addiction associated with video game use and given the global recognition of video game addiction. Defendant knowingly made false statements about the safety of its product.

562.    Defendant failed to disclose to users, including Plaintiff, that its product is designed to create and sustain addiction.

563.    Defendant intentionally failed to disclose to users the strategies and features designed and employed in its product to create and sustain addiction.

564.    Defendant intentionally failed to disclose its addictive strategies and features to entice users to continue gameplay and increase profits.

565.    If Defendant had not concealed, omitted, and misrepresented facts regarding the safety of its product, and had Plaintiff and/or Plaintiff's parents been aware that the product could cause significant harm such as brain damage, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, increased risk of suicide and behavioral addiction disorders, Plaintiff's parents would not have purchased or allowed Plaintiff to use or continue to use Defendant's product. Likewise, Plaintiff would not have used or continued to use Defendant's product. Alternatively, if Defendant had adequately warned or instructed Plaintiff or Plaintiff's parents, they would have taken precautions when using Defendant's product in order to eliminate or mitigate the risk of harm.

566.    Plaintiff and Plaintiff's parents were unaware of the dangerous and addictive nature of Defendant's product. Plaintiff and Plaintiff's parents reasonably relied on Defendant's representations that its product was safe for use, particularly for minors.

567.    Plaintiff and Plaintiff's parents reasonably relied on Defendant's representations and did not know, nor had any way of knowing, about the misrepresentations about Defendant's product.

568.    A reasonable person, including Plaintiff and Plaintiff's parents, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendant's product – to be important when deciding whether to purchase, download, use, or to continue to use, that product. Thus, Plaintiff and Plaintiff's parents justifiably relied

1  on Defendant's misrepresentations that the product was safe when purchasing, using, and/or continuing
2  to use Defendant's product.

3      569.    Because of Plaintiff's and Plaintiff's parents' reasonable reliance on Defendant's
4  representations, Plaintiff and Plaintiff's parents sustained physical and psychological harm, as well as
5  economic damages.

6      570.    As a direct and proximate result of Defendant's material misrepresentations and false
7  statements, Plaintiff suffered video game addiction, psychological injury, emotional distress, diminished
8  social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and
9  physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in
10  academic performance, which resulted in academic dismissal.

11      571.    Defendant's actions and omissions as alleged in this Complaint were intentional,
12  oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard
13  for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus,
14  Plaintiff seeks actual and punitive damages according to proof.

15              **COUNT XVI– NEGLIGENT MISREPRESENTATION**

16      **(Against Defendant Microsoft in its capacity as the manufacturer of the Xbox Platform)**

17      572.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every
18  paragraph of this Complaint as if repeated in full here.

19      573.    At all relevant times, Defendant was engaged in the business of designing, developing,
20  managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting,
21  controlling, supplying, leasing, selling, and/or otherwise distributing its product used by Plaintiff, which
22  are defective and unreasonably dangerous.

23      574.    As detailed herein, Defendant knew about the defective conditions of its product and that
24  the product posed serious health risks to users, particularly minors.

25      575.    Defendant designed the Xbox Product with addictive psychological features to keep users
26  playing more often and for longer periods of time, while knowing that abuse and compulsive use by
27  youth can lead to injury, but concealed this information from the public and product users, including
28  Plaintiff and Plaintiff's parents.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

576.    Defendant knew of the risks associated with the use of its product based on internal research and external studies known within the industry.

577.    Defendant could have disclosed the defective condition of its product to the public and could have advised that the product posed serious health risks to users, particularly youth. Defendant took no such action; instead, Defendant omitted the safety risks from any disclosures.

578.    Defendant knowingly and intentionally misrepresented that its product was safe for use, and safe as an educational tool, to further entice users to continue engaging with its product, including Plaintiff and Plaintiff's parents, while simultaneously knowing that its product caused addiction and compulsive use.

579.    Defendant stated that "Xbox strives to create a safer gaming experience for you and your family," and that its Xbox Store is "safer for the whole family" to use. Defendant also stated that it "hold[s] [itself] accountable for making [its] platforms as safe as possible for all players" and it "will promote the availability of our safety tools through our platforms, support channels, services, on our websites and in retail stores to reach more players and parents."

580.    Defendant intended for users, including Plaintiff, to rely on its representations that its product was safe for use to keep users engaging with its product and increase its profits, and purposefully marketed its product to minors for that reason. Defendant's representations about safety were material in keeping users engaged with their product and to increase its profits.

581.    However, Defendant had no reasonable grounds to believe that its product was safe given the internal and external research on addiction associated with video game use and given the global recognition of video game addiction. Defendant made false statements about the safety of its product.

582.    Defendant failed to disclose to users, including Plaintiff and Plaintiff's parents, that its product is designed to create and sustain addiction.

583.    Defendant failed to disclose to users the strategies and features designed and employed in its product to create and sustain addiction.

584.    Defendant failed to disclose its addictive strategies and features to entice users to continue gameplay and increase profits.

585.    If Defendant had not concealed, omitted, and misrepresented facts regarding the safety of its product, and had Plaintiff and/or Plaintiff's parents been aware that the product could cause significant harm such as brain damage, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, increased risk of suicide and behavioral addiction disorders, Plaintiff's parents would not have purchased or allowed Plaintiff to use or continue to use Defendant's product. Likewise, Plaintiff would not have used or continued to use Defendant's product. Alternatively, if Defendant had adequately warned or instructed Plaintiff and/or Plaintiff's parents, they would have taken precautions when using Defendant's product in order to eliminate or mitigate the risk of harm.

586.    Plaintiff and Plaintiff's parents were unaware of the dangerous and addictive nature of Defendant's product. Plaintiff and Plaintiff's parents reasonably relied on Defendant's representations that its product was safe for use, particularly for minors.

587.    Plaintiff and Plaintiff's parents reasonably relied on Defendant's representations and did not know, nor had any way of knowing, about the misrepresentations about Defendant's product.

588.    A reasonable person, including Plaintiff and Plaintiff's parents, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendant's product – to be important when deciding whether to purchase, download, use, or to continue to use, that product. Thus, Plaintiff and Plaintiff's parents justifiably relied on Defendant's misrepresentations that the product was safe when purchasing, using, and/or continuing to use the product.

589.    Because of Plaintiff's and Plaintiff's parents' reasonable reliance on Defendant's representations, Plaintiff sustained physical and psychological harm, as well as economic damages.

590.    Defendant's misrepresentations were a substantial factor in directly and proximately causing harm to Plaintiff, who suffered psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

1    **COUNT XVII – FRAUD**

2    **(Against Defendant Microsoft in its capacity as the manufacturer of the Xbox Platform)**

3        580.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if

4    repeated in full here.

5        581.    At all relevant times, Defendant was engaged in the business of designing, developing,

6    managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting,

7    controlling, supplying, leasing, selling, and/or otherwise distributing the Xbox Product used by Plaintiff,

8    which is defective and unreasonably dangerous due to its inclusion of operant condition behavior

9    modification techniques and it's the concealment of operant conditioning in Minecraft, Roblox, and

10   Fortnite, which was utilized to elicit continuous video game play which resulted in video game addiction

11   and the sequalae that goes with video game addiction.

12       582.    As detailed herein, Defendant knew about the defective conditions of its product and that

13   the product posed serious health risks to users, particularly minors, young adults, and neurodivergent

14   individuals.

15       583.    Defendant knew its product posed risks to minors, like Plaintiff, based on internal

16   research and external studies known in the industry and to Defendant; yet Defendant misrepresented the

17   safety and value of its product for the purpose of inducing users, like Plaintiff, to purchase its product,

18   to continue using Defendant's product, and encourage the addiction knowingly caused by Defendant's

19   product.

20       584.    Defendant stated that "Xbox strives to create a safer gaming experience for you and your

21   family," and that its Xbox Store is "safer for the whole family" to use. Defendant also stated that it

22   "hold[s] [itself] accountable for making [its] platforms as safe as possible for all players" and it "will

23   promote the availability of our safety tools through our platforms, support channels, services, on our

24   websites and in retail stores to reach more players and parents."

25       585.    Defendant designed the Xbox Product with addictive psychological features to keep users

26   playing more often and for longer periods of time, while knowing that abuse and compulsive use by

27   youth can lead to injury, but concealed this information from the public and product users, including

28   Plaintiff and Plaintiff's parents.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

586.    Defendant could have disclosed the defective condition of its product to the public and could have advised that the product posed serious health risks to users, particularly youth. Defendant took no such action; instead, Defendant affirmatively opted to omit the safety risks from any disclosures or marketing practices.

587.    Defendant knowingly and intentionally misrepresented that its product was safe for use to further entice users to continue engaging with its product, including Plaintiff and Plaintiff's parents.

588.    Defendant intended for users, including Plaintiff and Plaintiff's parents, to rely on its representations that its product was safe for use to keep users engaging with its product and increase its profits, and purposefully marketed its product to minors for that reason. Defendant's representations about safety were material in keeping users engaged with its product and to increase its profits.

589.    If Defendant had not concealed, omitted, and misrepresented facts regarding the safety of its product, and had Plaintiff and/or Plaintiff's parents been aware that the product could cause significant harm such as brain damage, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, increased risk of suicide and behavioral addiction disorders, Plaintiff's parents would not have purchased or allowed Plaintiff to use or continue to use Defendant's product. Likewise, Plaintiff would not have used or continued to use Defendant's product. Alternatively, if Defendant had adequately warned or instructed Plaintiff's parents and/or Plaintiff, they would have taken precautions when using Defendant's product in order to eliminate or mitigate the risk of harm.

590.    Plaintiff's parents would not have allowed Plaintiff to use or continue to use Defendant's product. Likewise, Plaintiff would not have used or continued to use Defendant's product. Alternatively, if Defendant had adequately warned or instructed Plaintiff's parents and/or Plaintiff, they would have taken precautions when using Defendant's product in order to eliminate or mitigate the risk of harm.

591.    However, Defendant had no reasonable grounds to believe that its product was safe given the internal and external research on addiction and given the global recognition of video game addiction. Defendant knowingly made false statements about the safety of its product.

592.    As a direct and proximate result of Defendant's material omissions, Plaintiff and Plaintiff's parents had no reason to believe that Defendant's product was unsafe for children to use.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

593.    Plaintiff and Plaintiff's parents reasonably relied on Defendant's misrepresentations that its product was safe for use.

594.    A reasonable person, including Plaintiff and Plaintiff's parents would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendant's product – to be important when deciding whether to purchase, download, use, or to continue to use, that product. Thus, Plaintiff and Plaintiff's parents justifiably relied on Defendant's misrepresentations that the product was safe when purchasing, using, and/or continuing to use Defendant's product.

595.    As a direct and proximate result of Defendant's material misrepresentations and false statements, Plaintiff suffered from video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

596.    Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

**COUNT XIX – PUNITIVE DAMAGES**

**(Against All Defendants)**

597.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if repeated in full here.

598.    Plaintiff alleges that Defendants' conduct was undertaken with malice, oppression, or fraud, as described in California Civil Code § 3294.

599.    More specifically, Defendant willfully and consciously disregarded the safety and rights of others, engaged in intentional misrepresentation, and conducted themselves in a despicable manner, with knowledge that such acts would likely cause injury, by implementing subversive operant conditioning behavior modification systems while failing to provide:

    a.    warnings of the use of operant conditioning behavior modification systems;

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

b.      fully informed consent to operant conditioning behavior modification systems;

c.      robust age verification mechanisms;

d.      effective parental controls;

e.      removal of barriers to the enactment of parental controls;

f.      warnings as to the health effects of use and extended use upon sign-up;

g.      opt-in restrictions to the length and frequency of sessions;

h.      self-limiting tools, including but not limited to session time notifications, warnings, or reports.

i.      tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

j.      self-imposed limits for microtransactions; and

k.      others as set forth herein.

600.    As a direct and proximate result of Defendants' egregious conduct in prioritizing profits at the expense of minors with knowledge of the attendant risks and their failure to mitigate those risks, Plaintiff is entitled to an award of exemplary and punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future. Accordingly, Plaintiff requests punitive damages as permitted by law.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff Talan Bacalso, for the stated causes of action, prays for judgment against all Defendants as follows:

i.      For damages to be determined by the jury, in an amount exceeding the minimum jurisdictional requirement of this Court, and adequate to compensate Plaintiff for all injuries and damages sustained;

ii.      For all general and special damages caused by the conduct of the Defendants;

iii.      For the costs of litigating this case;

iv.      For all pre-judgment and post-judgment interest;

v.      For Plaintiff's costs of suit herein;

vi.      For injunctive relief;

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

vii.    For attorneys' fees;

viii.   For exemplary and/or punitive damages according to proof at the time of trial; and

ix.     For such other and further relief, whether at law or in equity, to which this Court deems just and proper.

Respectfully submitted, this 10th day of October, 2025.

                    **PARAFINCZUK WOLF, P.A.**


                    By: _John A. Bruegger_
                        John A. Bruegger, Esq. (SBN: 250494)
                        jbruegger@parawolf.com
                        5550 Glades Road, Suite 500
                        Boca Raton, FL 33431
                        Telephone: (954) 462-6700
                        Fax: (954) 462-6567

                        *Counsel for Plaintiff Talan Bacalso*

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**